# ALABAMA POWER CO. *v.* DAVIS

No. 76-451. Argued April 25-26, 1977—Decided June 6, 1977

*H. Hampton Boles* argued the cause for petitioner. With him on the brief were *John Bingham* and *Marshall Timberlake*.

*Allan A. Ryan, Jr.,* argued the cause for respondent. With him on the brief were *Solicitor General McCree, Assistant*

*Attorney General Babcock, Robert E. Kopp,* and *William H. Berger.*[*]

Mr. Justice Marshall delivered the opinion of the Court.

Respondent Davis became a permanent employee of petitioner Alabama Power Co. on August 16, 1936, and continued to work until March 18, 1943, when he left to enter the military. After serving in the military for 30 months, he resumed his position with Alabama Power, where he worked until he retired on June 1, 1971. Davis received credit under the company pension plan for his service from August 16, 1937,[1] until the date of his retirement, with the exception of the time he spent in the military and some time spent on strike. Davis claimed that § 9 of the Military Selective Service Act of 1967, 50 U. S. C. App. § 459 (b),[2] requires Alabama Power to give him credit toward his pension for his period of military service. With the assistance of the United States Attorney,[3] he sued to vindicate that asserted right. The District Court, 383 F. Supp. 880 (ND Ala. 1974), and the Court of Appeals for the Fifth Circuit, 542 F. 2d 650 (1976), agreed with Davis. Because of the importance of the issue and a conflict among the Circuits,[4] we granted certiorari, 429 U. S. 1037.[5] We affirm.

---

[*]Briefs of *amici curiae* urging reversal were filed by *Hugh M. Finneran* for PPG Industries, Inc.; and by *Carl E. Sanders, Michael C. Murphy,* and *John L. Taylor, Jr.,* for Lockheed-Georgia Co., a division of Lockheed Aircraft Corp.

[1] Employees do not become eligible to participate in the plan until they have worked for one year. See *infra,* at 590.

[2] Section 459 (b) has been recodified, without substantial change, as 38 U. S. C. § 2021 (1970 ed., Supp. V).

[3] See 50 U. S. C. App. § 459 (d), now codified at 38 U. S. C. § 2022 (1970 ed., Supp. V).

[4] Compare *Jackson* v. *Beech Aircraft Corp.,* 517 F. 2d 1322 (CA10 1975) and *Litwicki* v. *Pittsburgh Plate Glass Industries, Inc.,* 505 F. 2d

## I

The Military Selective Service Act provides the mechanism for manning the Armed Forces of the United States. Section 9 of the Act evidences Congress' desire to minimize the disruption in individuals' lives resulting from the national need for military personnel. It seeks to accomplish this goal by guaranteeing veterans that the jobs they had before they entered the military will be available to them upon their return to civilian life. Specifically, § 9 requires that any qualified person who leaves a permanent position with any employer to enter the military, satisfactorily completes his military service, and applies for re-employment within 90 days of his discharge from the military,

> "be restored by such employer or his successor in interest to such position or to a position of like seniority, status, and pay . . . unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so." 50 U. S. C. App. § 459 (b) (B) (i).

Moreover, any person so restored to a position

> "shall be considered as having been on furlough or leave of absence during his period of training and service in the armed forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without

189 (CA3 1974) (denying pension credit), with *Smith* v. *Industrial Employers & Distributors Assn.*, 546 F. 2d 314 (CA9 1976) (granting past service credit and denying future service credit).

[5] The grant of certiorari was limited to the first question presented, excluding the issue of the applicability of the Alabama statute of limitations.

cause within one year after such restoration." 50 U. S. C. App. § 459 (c) (1).

In our first confrontation with the predecessor of § 9,[6] we held that the statutory protection against discharge within a year of re-employment did not protect a veteran from being laid off while nonveterans with greater seniority retained their jobs. *Fishgold* v. *Sullivan Drydock & Repair Corp.*, 328 U. S. 275 (1946). In reaching this conclusion, we announced two principles that have governed all subsequent interpretations of the re-employment rights of veterans. First, we stated that under the Act:

> "[The veteran] does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously during the war." *Id.*, at 284–285.

Congress incorporated this doctrine in succeeding re-enactments of the re-employment provision. See 50 U. S. C. App. § 459 (c) (2).[7] The second guiding principle we identified was:

> "This legislation is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need. . . . And no practice of employers or agreements between employers and unions can cut down the service adjustment benefits which

---

[6] The Selective Training and Service Act of 1940, c. 720, § 8 (b), 54 Stat. 890.

[7] "It is declared to be the sense of the Congress that any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) of this section should be so restored in such manner as to give him such status in his employment as he would have enjoyed if he had continued in such employment continuously from the time of his entering the armed forces until the time of his restoration to such employment."

This provision is now codified at 38 U. S. C. § 2021 (b) (2) (1970 ed., Supp. V).

Congress has secured the veteran under the Act." 328 U. S., at 285.

Our next cases were also concerned with the extent of the protection afforded rights that were clearly within the Act's scope. *Trailmobile Co.* v. *Whirls,* 331 U. S. 40 (1947); *Aeronautical Lodge* v. *Campbell,* 337 U. S. 521 (1949); *Oakley* v. *Louisville & N. R. Co.,* 338 U. S. 278 (1949). More recently, however, our efforts have been directed at determining whether a particular right claimed by a veteran is an aspect of the "seniority" which the Act protects. We have been unable to rely on either the language or the legislative history of the Act when making these determinations, for neither contains a definition of "seniority."

We first faced this problem in *McKinney* v. *Missouri-K.-T. R. Co.,* 357 U. S. 265 (1958). McKinney had been re-employed at a higher level than he had attained when he left for military service, with seniority in his new position dating from his return to work. When his job was abolished, he claimed that his seniority at the higher level should have dated from the time he would have been eligible to reach that level had he not served in the military. This Court rejected his claim because of the contingent nature of his expectation of being promoted from the job he previously held. That promotion, the Court found, depended "not simply on seniority or some other form of automatic progression, but on the exercise of discretion on the part of the employer." *Id.,* at 272. Since the promotion would not have come automatically had McKinney continued to ride the seniority escalator, the Court concluded that neither the promotion nor a seniority date calculated as of the time he might have been promoted were incidents of the "seniority" protected by the Act.[8]

---

[8] "[Section] 9 (c) does not guarantee the returning serviceman a perfect reproduction of the civilian employment that might have been his if he had not been called to the colors. Much there is that might have flowed

Six years later, the Court again considered whether a veteran was entitled to a seniority date calculated as if he had obtained a higher level position while in the military. *Tilton* v. *Missouri Pac. R. Co.*, 376 U. S. 169 (1964). Tilton had been promoted before he left the railroad to enter the military, but he had not worked enough days to complete the probationary period necessary to obtain permanent status and begin accumulating seniority in the higher level job. When he returned to the railroad, he successfully completed the remainder of the probationary period. The company set his seniority date as of the time he actually finished the probationary period; he claimed that the date should have been fixed as of the time he would have satisfied the probationary work requirement had it not been for his military service.

This Court agreed. Unlike the situation in *McKinney,* we found that the only management discretion involved was the decision to allow Tilton to assume probationary status in the higher level position, and that discretion had been exercised before he entered the military. Tilton's satisfactory completion of the probationary period after he was reinstated by the railroad was sufficient indication that he would have completed that period earlier if his tenure had not been interrupted by his service to his country. The mere possibility that his ride on the escalator might have been interrupted by some other circumstance could not be allowed to deny him the status he almost certainly would have obtained:

> "In every veteran seniority case the possibility exists that work of the particular type might not have been avail-

from experience, effort, or chance to which he cannot lay claim under the statute. Section 9 (c) does not assure him that the past with all its possibilities of betterment will be recalled. Its very important but limited purpose is to assure that those changes and advancements in status that would necessarily have occurred simply by virtue of continued employment will not be denied the veteran because of his absence in the military service." 357 U. S., at 271–272.

able; that the veteran would not have worked satisfactorily during the period of his absence; that he might not have elected to accept the higher position; or that sickness might have prevented him from continuing his employment. In light of the purpose and history of this statute, however, we cannot assume that Congress intended possibilities of this sort to defeat the veteran's seniority rights." 376 U. S., at 180–181.

In *McKinney* and *Tilton,* the Court decided whether the veterans' promotions were incidents of the "seniority" protected by the Act, but in both cases, the benefit claimed by the veterans—earlier seniority dates—was clearly "seniority." Our most recent cases have involved claims to benefits that could not be so easily classified. These cases have required us to consider not only the relative certainty of the benefit's accrual but also the nature of the benefit itself.

We first encountered this added complexity in *Accardi* v. *Pennsylvania R. Co.,* 383 U. S. 225 (1966), a case involving a claim to severance pay. The petitioners in *Accardi* were tugboat firemen who had left their jobs for military service and had later been restored with appropriate seniority credit. When technological change led to the elimination of the position of tugboat fireman, the railroad agreed to provide severance pay, with the amount of the payment dependent on the employee's length of "compensated service." Since Accardi and his colleagues had not received compensation from the company during their military service, the railroad did not give them credit for that time when calculating their severance payments.

This Court ruled in favor of the firemen. It was clear that had the petitioners remained on their jobs, they would have received severance pay credit for the years they spent in the military. Therefore, the reasonable-certainty criterion established in *McKinney* and *Tilton* was satisfied. The company

argued, however, that the payment was not based on, and so was not an incident of, seniority, but rather was based on total actual service to the railroad. While questioning the company's argument because of the "bizarre results possible under the definition of 'compensated service,' " 383 U. S., at 230,[9] we rejected it because the "real nature" of the payments was compensation for the lost rights and expectations that accrued as the employees' longevity on the job increased. *Ibid.* That nature could not be disguised by use of a "compensated service" formula to calculate the amount of the payments. Accordingly, we concluded that

> "the amount of these allowances is just as much a perquisite of seniority as the more traditional benefits such as work preference and order of lay-off and recall." *Ibid.*

Failing to credit the veterans with their military service time when calculating their payments therefore violated the Act's requirement that they be reinstated without loss of seniority.[10]

Most recently, in *Foster* v. *Dravo Corp.*, 420 U. S. 92 (1975), we dealt with another claim for payment because of time spent in military service. Foster had worked for his private employer for seven weeks in 1967, spent 18 months in the military, and returned to work for the last 13 weeks of 1968. He claimed that he was entitled to vacation pay for both

---

[9] It was possible for an employee to receive credit for a full year of "compensated service" by working only seven well-timed days during the year. The company defined a month of "compensated service" as any month during which the employee worked one or more days, and a year of "compensated service" was defined as 12 such months, or a major portion thereof.

[10] The Court also held that whatever the full scope of the statutory language governing "other benefits" contained in § 459 (c), see *supra,* at 583–584, that language was intended to add to the protections afforded the veteran's seniority rights, not to lessen those protections. 383 U. S., at 231–232. The Court's conclusion that the severance payments were perquisites of seniority therefore made unnecessary consideration of the "other benefits" provision.

years, although the collective-bargaining agreement granted full vacation benefits only for 25 weeks of work in a calendar year.

Again focusing on the nature of the benefit at issue, we rejected Foster's claim. Vacation benefits, we held, are "intended as a form of short-term compensation for work performed," *id.*, at 100, not as a reward for longevity with an employer.[11] In reaching this conclusion, we noted the work requirement imposed by the collective-bargaining contract, the proportionate increase in vacation benefits that resulted from overtime work, and the availability of pro rata benefits if an employee was laid off before he had worked the required number of weeks. These facts, however, were sufficient only to "lend substantial support," *ibid.*, to the employer's argument that the vacation benefits were a form of pay for work done. The nature of the benefits—"the common conception of a vacation as a reward for and respite from a lengthy period of labor," *id.*, at 101—was decisive.

Thus, our cases have identified two axes of analysis for determining whether a benefit is a right of seniority secured to a veteran by § 9. If the benefit would have accrued, with reasonable certainty, had the veteran been continuously employed by the private employer, and if it is in the nature of a reward for length of service, it is a "perquisite of seniority." If, on the other hand, the veteran's right to the benefit at the time he entered the military was subject to a significant contingency, or if the benefit is in the nature of short-term compensation for services rendered, it is not an aspect of seniority within the coverage of § 9. We evaluate respondent Davis' right to pension credit for his years in the military in light of these principles.

---

[11] Under the collective-bargaining agreement in *Foster*, the length of an employee's vacation increased with his length of continuous employment with the firm. The company conceded that the employee's time in military service had to be counted in determining the length of his vacation. 420 U. S., at 101 n. 9.

## II ·

Alabama Power established its pension plan on July 1, 1944, during the time Davis was in the military. The plan, which is funded entirely by the company, covers all "full-time regular employee[s]" who have completed one year of continuous service with the company and are at least 25 years old. App. 58–59. Under the labor agreements and practices of the company, a full-time regular employee is one who, with limited exceptions,[12] works a 40-hour week. A covered employee has no vested right to any benefit from the plan until he has completed 20 years of service, which for this purpose includes time spent in the military, or has completed 15 years of service and attained the age of 50. *Id.*, at 90–91.[13] Normal retirement age under the plan is 65, but an employee with 20 years of "accredited service" can elect to retire any time after he has reached the age of 55. App. to Pet. for Cert. 43a–44a. Davis chose the early retirement option.

The concept of "accredited service" is a major determinant of the amount of benefits paid and is the source of the present controversy. The plan defines "accredited service" as the period of "future service" together with the period of "past service." *Id.*, at 34a–35a. These terms, in turn, are defined as an employee's period of service after the initiation of the pension plan and his inclusion within it (future service) and his period of service prior to that date (past service). *Id.*, at

---

[12] The established exceptions include annual vacations, paid holidays, 10 days of annual sick leave, which may be accumulated up to a maximum of 30 days, and up to three days' leave in case of a death in the employee's immediate family. In addition, longtime employees may be allowed up to nine months of extended sick leave.

[13] The Employee Retirement Income Security Act of 1974, § 203, 88 Stat. 854, 29 U. S. C. § 1053 (1970 ed., Supp. V), establishes vesting requirements more favorable to employees than those described in the text. This law, which generally requires vesting within 10 to 15 years, did not affect respondent and, insofar as is relevant to the question presented in this case, does not alter the nature of pension plans.

35a. Future service is credited to an employee "for service rendered to the Company" as a full-time, regular employee and for periods of authorized leave of absence with pay. Employees on leave of absence without regular pay, and persons serving in the military, are not credited with future service during their absence from the company. *Id.*, at 40a.[14] Retirement benefits are calculated by the use of formulas in which years of accredited service are multiplied by an earnings factor.[15] Had Davis received accredited service for the time he spent in the military, his monthly pension payment would have been $216.06 rather than the $198.95 to which the company said he was entitled.

It is clear that the reasonable-certainty requirement of *McKinney* and *Tilton* is satisfied in this case. Respondent's work history both before and after his military tour of duty demonstrates that if he had not entered the military, he would almost certainly have accumulated accredited service for the period between March 18, 1943, and October 8, 1945. Unpredictable occurrences might have intervened, but "we cannot

---

[14] A limited exception to this rule, see App. 61–62, was not applicable to Davis.

[15] Davis' pension payment is calculated under § V4 (b) (ii) of the plan. That section provides:

"The minimum Retirement Income payable after January 1, 1966 to an employee included in the Plan retiring from the service of the Company after January 1, 1966 at his Early Retirement Date (before adjustment for Provisional Payee designation, if any) shall be an amount equal to 1% of his monthly earnings on his Early Retirement Date multiplied by his years of Accredited Service, reduced by [specified amounts]." App. 70.

"Normal retirement income" under the plan is calculated by reference to specified percentages of an employee's earnings, exclusive of overtime, during his years with the company. *Id.*, at 65–68, 73. The amount to which an employee would be entitled under the "normal retirement income" formula has, however, been periodically adjusted upward by formulas which, like the formula applicable to Davis, call for multiplication of a percentage of recent earnings by the number of years of accredited service. See *id.*, at 74–84.

assume that Congress intended possibilities of this sort to defeat the veteran's seniority rights." *Tilton* v. *Missouri Pac. R. Co.,* 376 U. S., at 181.

Alabama Power contends, however, that pension payments should be viewed as compensation for service rendered, like the vacation payments in *Foster,* rather than as a perquisite of seniority like the severance payments in *Accardi.* The company argues that the definition of accredited service in terms of full-time service to the company is a bona fide, substantial work requirement which, under *Foster,* "is strong evidence that the benefit in question was intended as a form of compensation." 420 U. S., at 99. Since § 9 does not grant veterans the right to compensation for work they have not performed, Alabama Power concludes that Davis is not entitled to his claimed pension increase.

As we noted in our discussion of *Foster,* that case turned on the nature of vacation benefits, not on the particular formula by which those benefits were calculated. Even the most traditional kinds of seniority privileges could be as easily tied to a work requirement as to the more usual criterion of time as an employee. Yet, as we held in *Fishgold,* "no practice of employers . . . can cut down the service adjustment benefits which Congress has secured the veteran under the Act." 328 U. S., at 285. We must look beyond the overly simplistic analysis suggested by Alabama Power to the nature of the payments.

It is obvious that pension payments have some resemblance to compensation for work performed. Funding a pension program is a current cost of employing potential pension recipients, as are wages. The size of pension benefits is a subject of collective bargaining,[16] and future benefits may be

---

[16] *Inland Steel Co.* v. *NLRB,* 170 F. 2d 247 (CA7 1948), cert. denied on this issue, 336 U. S. 960 (1949), aff'd on other grounds, *Steelworkers* v. *NLRB,* 339 U. S. 382 (1950). The company contends that *Inland Steel* holds that pensions are "wages" and that they must therefore be classified

traded off against current compensation.[17] The same observations, however, can be made about any benefit and therefore are of little assistance in determining whether a particular benefit recompenses labor or rewards longevity with an employer.

Other aspects of pension plans like the one established by petitioner [18] suggest that the "true nature" of the pension payment is a reward for length of service. The most significant factor pointing to this conclusion is the lengthy period required for pension rights to vest in the employee. It is difficult to maintain that a pension increment is deferred compensation for a year of actual service when it is only the passage of years in the same company's employ, and not the service rendered, that entitles the employee to that increment.

---

as "other benefits," see n. 10, *supra*, under the Military Selective Service Act. *Inland Steel* concluded, however, only that pensions are a mandatory subject of collective bargaining under the National Labor Relations Act (NLRA) because they are either wages "or other conditions of employment." 170 F. 2d, at 249–255. Even if pensions are "wages" for the purposes of the NLRA, that classification would not control their treatment under the very different statute at issue in this case. Cf. *United States* v. *Embassy Restaurant,* 359 U. S. 29, 33 (1959) (payments to union welfare fund may be "wages" under NLRA but not under Bankruptcy Act).

[17] Cf. S. Slichter, J. Healy, & E. Livernash, The Impact of Collective Bargaining on Management 373 (1960) (pension plans encouraged during World War II by difficulty of obtaining general wage increases).

[18] Petitioner's plan is a "defined benefit" plan, under which the benefits to be received by employees are fixed and the employer's contribution is adjusted to whatever level is necessary to provide those benefits. The other basic type of pension is a "defined contribution" plan, under which the employer's contribution is fixed and the employee receives whatever level of benefits the amount contributed on his behalf will provide. See 29 U. S. C. §§ 1002 (34), (35) (1970 ed., Supp. V); Note, Fiduciary Standards and the Prudent Man Rule Under the Employee Retirement Income Security Act of 1974, 88 Harv. L. Rev. 960, 961–963 (1975). We intimate no views on whether defined contribution plans are to be treated differently from defined benefit plans under the Military Selective Service Act.

Moreover, because of the vesting requirement and the use of payment formulas that depend on earnings at the time of retirement, both the cost to the employer and the payment to the employee for each year of service depend directly on the length of time the employee continues to work for that employer. Periodic adjustments of the benefit formulas to account for unanticipated increases in living costs, see App. 74–84, emphasize the dissociation of payment levels from the work that Alabama Power claims the payments compensate.

The function of pension plans in the employment system also supports respondent's claim. A pension plan assures employees that by devoting a large portion of their working years to a single employer, they will achieve some financial security in their years of retirement. By rewarding lengthy service, a plan may reduce employee turnover and training costs and help an employer secure the benefits of a stable work force. See D. McGill, Fundamentals of Private Pensions 21–23 (3d ed. 1975). In addition, by providing economic security in retirement, pension plans encourage longtime employees whose working efficiency may be on the decline to retire and make way for younger workers. *Id.,* at 21–22; S. Slichter, J. Healey, & E. Livernash, The Impact of Collective Bargaining on Management 374 (1960). The relationship between pension payments and passage of time as an employee is central to both of these functions.

We conclude, therefore, that pension payments are predominantly rewards for continuous employment with the same employer. Protecting veterans from the loss of such rewards when the break in their employment resulted from their response to the country's military needs is the purpose of § 9. That purpose is fulfilled in this case by requiring Alabama Power to pay Davis the pension to which he would have been entitled by virtue of his lengthy service if he had not been called to the colors. Accordingly, the judgment below is affirmed.

*It is so ordered.*