James G. MOWDY, Plaintiff,

v.

ADA BOARD OF EDUCATION, Defendant.

No. 77–29–C.

United States District Court, E. D. Oklahoma.

Nov. 23, 1977.

See also, D.C., 76 F.R.D. 436.

Betty O. Williams, Asst. U. S. Atty., Muskogee, Okl., for plaintiff.

Kenneth R. Johnson, Ada, Okl., for defendant.

## MEMORANDUM OPINION

MORRIS, Chief Judge.

This is a civil action brought pursuant to the Veterans' Reemployment Rights Act, 38 U.S.C. § 2021 et seq. Plaintiff seeks to recover loss of wages and benefits allegedly sustained as a result of defendant's refusal to reinstate him to his fulltime teaching position after his honorable discharge from the United States Air Force. Trial was had to the court sitting without a jury on October 20, 1977, pursuant to the court's order of September 27, 1977, setting the case for nonjury trial.

Plaintiff is a high school mathematics teacher. He taught at the high or junior high school level in Ada, Oklahoma, for four years, namely from August, 1971, until March 24, 1975. The first three years he taught at the Ada Junior High School and from August, 1974, until March 24, 1975, he taught at the Ada High School. At the end of each academic year his contract was renewed as his performance was satisfactory. James Mowdy became a tenured teacher after he had taught for three years at the Ada city schools.

On January 31, 1975, plaintiff sent his letter of resignation to the Ada Board of Education stating that "[o]n March 27, 1975, I will report to Officer Training School in San Antonio, Texas, with the United States Air Force. My service with

the Ada Schools will therefore be terminated on March 24, 1975." [1] James Mowdy had always wanted to join the United States Air Force. He decided to resign before the end of the second semester of the 1974/75 academic year because he was approaching 26 years of age, and his recruiter had sent him a letter advising him that if he wanted to join he had to do it before reaching that age. Plaintiff had discussed his resignation with Max Skelton, Superintendent of the Ada city schools. Dr. Skelton told Mr. Mowdy to write a letter indicating what his plans were with respect to resignation. The letter of resignation which plaintiff then wrote on January 31, 1975 was presented to the Board of Education at its next meeting and plaintiff's resignation was accepted effective March 24, 1975.

Plaintiff continued to perform his teaching duties until March 24, 1975, and immediately thereafter entered the officer training school of the United States Air Force. June Murphy was hired to replace James Mowdy and teach his mathematics course for the remainder of the 1974/75 school year. She had a teaching certificate and was fully qualified to teach the course. There was never any indication on plaintiff's part that his resignation was anything but permanent; there was no suggestion by him that he might return to the Ada High School. Plaintiff did not request a temporary leave of absence but instead resigned permanently. The Ada Board of Education, pursuant to a written policy, treats a request for a temporary leave of absence differently from a request for termination. It is standard procedure to provide newly hired teachers with a copy of the policy. Under the written policy, requests for temporary military leaves of absence are honored and reemployment is guaranteed upon return from temporary leave. Military duty of a few weeks or several months would qualify as a temporary leave under the policy but military duty with a duration of several years would not.

Plaintiff entered upon active duty with the Air Force on March 25, 1975. [2] His prior inactive service of two months began on January 25, 1975, when he entered into an agreement with the Air Force that he would undergo a twelve week training program if released from his teaching obligation. [3] His pay in the military was $500.00 per month. He did not receive a bonus for signing a contract with the Air Force.

Upon completion of officer training school plaintiff had a choice of either accepting his commission as an officer in the Air Force or to return to civilian life. He elected not to accept his commission and therefore did not graduate from officer training school. If he had accepted his commission he would have been committed for 6 years. Graduation from officer training school would have been on July 1, 1975. Approximately one or two weeks prior to his scheduled graduation plaintiff decided to return to civilian life in order to assist his brother and father in their attempt to overcome financial difficulties which they were encountering with the ranch which the three of them owned. About one week before plaintiff decided to leave the Air Force he contacted Dr. Skelton by telephone and was told that no teaching position was open. Before he left the Air Force he knew that June Murphy had signed a contract to teach mathematics at Ada High School during the 1975/76 academic year. It is customary for the Ada Board of Education to contract with its teachers in April for the following academic year; state law makes this custom a practical necessity. [4]

June Murphy, who had replaced plaintiff during the second semester of the 1974/75 school year continued to teach mathematics during 1975/76 at the Ada High School

1. Plaintiff's Exhibit No. 1.

2. Defendant's Exhibit No. 1.

3. While plaintiff stated during cross examination that he signed on with the Air Force after he submitted his letter of resignation, defendant's exhibit 1 shows that his inactive service began two months prior to March 25, 1975, to-wit: January 25, 1975. This was six days before the plaintiff wrote his letter of resignation on January 31, 1975.

4. 70 Okl.Stat. § 6–101 E (1971).

pursuant to a written contract entered into between her and the Ada School Board on April 25, 1975.[5] She was the only new mathematics teacher employed for the contract year 1975/76. Her contract was executed prior to the telephone call plaintiff made in the middle of June to Dr. Skelton during which plaintiff inquired about reinstatement to his prior teaching position and was told that there were no openings and that all teachers were under contract.

Plaintiff was honorably discharged from the Air Force on July 1, 1975.[6] Approximately one week thereafter (on or about July 8, 1975) he went to see Dr. Skelton in his office to inquire about vacancies and again was told there were none. On or about July 15, 1975, plaintiff met with Dr. Skelton again to show to him a brochure regarding veterans' reinstatement rights.[7] Skelton had a copy made of a page of the pamphlet which he kept. Plaintiff was not offered any employment at that time. Subsequently plaintiff telephoned Dr. Skelton and told him that he insisted on his right of reemployment. Dr. Skelton asked him to fill out an employment application. On August 1, 1975, plaintiff sent a letter to Dr. Skelton requesting reinstatement.[8] Plaintiff also wrote school board members asking for reinstatement.

Dr. Skelton assured plaintiff that he would be reinstated at the earliest possible date but no later than at the beginning of the 1976/77 school year. Defendant knew that plaintiff could be employed for school year 1976/77 because June Murphy's contract could be cancelled inasmuch as she was a probationary teacher who had not taught the requisite three years to acquire tenure. Therefore, she could have been dismissed without cause effective at the expiration of her contract, to-wit: at the end of the 1975/76 school year, provided she was given notice prior to April 10, 1976.[9] At the time of plaintiff's repeated reinstatement requests in June, July and August of 1975, defendant was fully staffed and there was no need to employ anyone else. To employ plaintiff at that time would have been tantamount to the creation of an extra position which was not needed and would have been a waste of taxpayers' money. The Ada city schools are funded through local and state taxes and plaintiff's wages would have come from these sources.

In a letter dated October 10, 1975,[10] plaintiff was offered a half time position teaching eighth grade mathematics in the middle school. The parttime position had unexpectedly become open and was to commence at the beginning of the second semester of the 1975/76 school year. Plaintiff would have earned $3,260.16 as compared to $8,915.00 as a fulltime teacher. On October 13, 1975, plaintiff telephoned Dr. Skelton and informed him that he would not accept the parttime position. Skelton thereupon wrote plaintiff a letter, dated October 13, 1975,[11] to confirm plaintiff's rejection of the parttime offer. The letter advised plaintiff that defendant expected to fill the position within two weeks and further stated: "If you wish to reconsider your decision please contact us as soon as possible so that we will not have entered into a contract with another applicant." [12]

Since plaintiff was a tenured teacher who could only be terminated for cause, defendant considered itself obligated to offer plaintiff a job at the end of the 1975/76 school year even if the parttime position had been eliminated during or at the end of that school year.[13]

---

**5.** Defendant's Exhibit No. 4.

**6.** Plaintiff's Exhibit No. 2.

**7.** Defendant's Exhibit No. 2.

**8.** Plaintiff's Exhibit No. 3.

**9.** *See* 70 Okl.Stat. § 6–101 E (1971).

**10.** Defendant's Exhibit No. 3.

**11.** Plaintiff's Exhibit No. 4.

**12.** *Id.*

**13.** Plaintiff was asked on redirect examination whether he had testified during cross examination that Dr. Skelton had informed him that the school board would be released of any further reinstatement obligation with respect to plaintiff if he accepted the parttime position. Plaintiff answered the question in the affirmative.

An offer for a fulltime teaching position was made to plaintiff on April 7, 1976.[14] Pursuant to that offer plaintiff was to teach mathematics at Ada Middle School during the 1976/77 school year. At the same time plaintiff received an offer to teach mathematics in the McAlester school system; he declined defendant's offer and accepted the one from the McAlester school system.

During the 1975/76 school year plaintiff was not employed as a school teacher. While most school districts contract with their teachers in the spring, vacancies do sometimes open up during the summer months and it is not uncommon for teachers to be hired in August or September. In July of 1975, plaintiff contacted several school districts to inquire about vacancies. All of his attempts to secure employment during the 1975/76 school year were unsuccessful. He accordingly went to work on the ranch which he and his brother owned in partnership. At the beginning of the 1974/75 school year plaintiff and his brother were together in a ranching partnership. Previously, the ranch had been operated as a three-way partnership consisting of plaintiff, his brother and father. Plaintiff and his brother owned 800 acres and plaintiff's father owned 500 acres for a total of 1300 acres. By August, 1974, plaintiff's father was omitted as a partner since he was there solely on a helping basis. The managing of the ranch was done by plaintiff and his brother and by August, 1974, it was operated as a two-way partnership consisting of the two brothers.

The ranch was experiencing financial difficulties, which was the reason plaintiff gave for not accepting a commission in the Air Force. Plaintiff and his brother were liable under an FHA loan and a school land loan which applied to the 800 acres and cattle on that land. They encountered financial difficulties in 1974/75 in making the loan payments. These loan obligations were incurred before the commencement of the 1974/75 school year. Plaintiff, while working on the ranch he owned with his brother and while living with his parents, began to draw unemployment compensation of approximately $80.00 per week or every two weeks some time after the beginning of the 1975/76 school year.

Payments on the FHA and school land loans were made by plaintiff and his brother from revenues derived from cattle sales. Some payments were due annually and some semi-annually. During the 1975/76 school term, when plaintiff was working on the ranch, the school land loan payments were made and partial payments were made on the FHA loan. Similarly, during the 1974/75 school year the school land loan payments were made and FHA loan payments were partially made.

As a result of not being employed as a teacher during 1975/76 plaintiff had to make quarterly payments of $69.00 each to East Central University in accordance with the provisions of his national student defense loan. Plaintiff had taken out the $3,000.00 loan for a period of ten years. Under its provisions the debtor is given a

---

On recross examination plaintiff initially could neither recall the date of the telephone conversation during which Dr. Skelton allegedly made that statement, nor could plaintiff recall who instigated the telephone call. Upon further inquiry during recross plaintiff then identified the telephone call which he made to inform Dr. Skelton of his decision not to accept the parttime position as the one during which Skelton allegedly referred to the Board's fulfillment of its reinstatement obligations.

An examination of the record reveals, however, that plaintiff during cross examination referred to the Veterans Administration as the source informing plaintiff that his acceptance of the parttime position would release the Ada Board of Education of any further obligation.

Furthermore, Dr. Skelton testified that he did not advise James Mowdy regarding his reinstatement rights during the telephone conversation of October 13, 1975. Dr. Skelton further stated that in the event the parttime position had been eliminated he would still have had to offer plaintiff a job for the following school year because he was a tenured teacher who could only be terminated for cause.

The court finds that it was the Veterans Administration and not Dr. Skelton who advised plaintiff what effect his acceptance of the parttime position would have upon his reinstatement rights.

14. Defendant's Exhibit No. 5.

percentage deduction for each year during which he teaches. Thus, as long as plaintiff teaches he does not have to make payments on the loan. After having made payments during 1975/76 plaintiff's payments were again waived when he resumed teaching in 1976/77 at the high school in McAlester.

It is at the debtor/teacher's option to take advantage of the waiver of payments provision under the national student defense loan. This is not a benefit provided or paid by the school system. The school's sole function is to certify that the debtor who wishes to have his payments waived is in fact teaching at the school during the particular academic year. Dr. Skelton signs ten to fifteen loan waiver forms a year in his capacity as superintendent of the Ada city schools. The waiver form, provided by the Department of Health, Education and Welfare,[15] must be signed by the teacher/borrower and the authorized school official.

Plaintiff seeks to recover the wages he would have earned in 1975/76 if reinstated by the defendant. He also seeks to recover the amount of loan payments he had to make on his national student defense loan in 1975/76 on account of defendant's failure to reinstate him during that school term. Plaintiff contends that, notwithstanding defendant's contractual obligation with June Murphy and regardless of defendant's need or lack thereof for an additional teacher, defendant was obligated under the Veterans' Reemployment Rights Act to hire plaintiff upon his timely request after his honorable discharge.

Defendant contends that plaintiff failed to mitigate his damages, that his request for immediate reinstatement was unreasonable under the circumstances involved, and that, in any event, plaintiff cannot recover any payments he made on his national student defense loan.

The Veterans' Reemployment Rights Act provides in pertinent part:

§ 2021. Right to reemployment of inducted persons; benefits protected.

(a) In the case of any person who is inducted into the Armed Forces of the United States under the Military Selective Service Act (or under any prior or subsequent corresponding law) for training and service and who leaves a position (other than a temporary position) in the employ of any employer in order to perform such training and service, and (1) receives a certificate described in section 9(a) of the Military Selective Service Act (relating to the satisfactory completion of military service), and (2) makes application for reemployment within ninety days after such person is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year—

. . .

(B) if such position was in the employ of a State, or political subdivision thereof, or a private employer, such person shall—

(i) if still qualified to perform the duties of such position, be restored by such employer or the employer's successor in interest to such position or to a position of like seniority, status, and pay; . . .

. . .

*unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so.* Nothing in this chapter shall excuse noncompliance with any statute or ordinance of a State or political subdivision thereof establishing greater or additional rights or protections than the rights and protections established pursuant to this chapter.

(b)(1) Any person who is restored to or employed in a position in accordance with the provisions of clause (A) or (B) of subsection (a) of this section shall be considered as having been on furlough or leave of absence during such person's period of training and service in the Armed Forces, shall be so restored or reemployed without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to

**15.** Plaintiff's Exhibit No. 5.

established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration or reemployment.

(2) It is hereby declared to be the sense of the Congress that any person who is restored to or employed in a position in accordance with the provisions of clause (A) or (B) of subsection (a) of this section should be so restored or reemployed in such manner as to give such person such status in the person's employment as the person would have enjoyed if such person had continued in such employment continuously from the time of such person's entering the Armed Forces until the time of such person's restoration to such employment, or reemployment.

. . .

§ 2022. Enforcement procedures.

If any employer, who is a private employer or a State or political subdivision thereof, fails or refuses to comply with the provisions of section 2021(a), (b)(1), or (b)(3), or section 2024, the district court of the United States or any district in which such private employer maintains a place of business, or in which such State or political subdivision thereof exercises authority or carries out its functions, shall have the power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, specifically to require such employer to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action. Any such compensation shall be in addition to and shall not be deemed to diminish any of the benefits provided for in such provisions.

38 U.S.C. §§ 2021, 2022 (emphasis added). It is unquestioned that the Act "is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need." *Alabama Power*

*Co. v. Davis,* 431 U.S. 581, 584, 97 S.Ct. 2002, 2005, 52 L.Ed.2d 595 (1977); *Fishgold v. Sullivan Corp.,* 328 U.S. 275, 285, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946).

The board of education of an Oklahoma school district is required to enter into a written contract with any teacher who is employed for a total period of time in excess of twenty school days during a school year. 70 Okl.Stat. §§ 6–101 A, 6–105 B. And the board is under a duty to employ only persons who are necessary. *See* 70 Okl.Stat. § 5–117. 70 Okl.Stat. § 6–101 E provides in pertinent part:

A board of education shall have authority to enter into written contracts with teachers for the ensuing fiscal year prior to the beginning of such year. If, prior to April 10, a board of education has not entered into a written contract with a regularly employed teacher or notified him in writing by registered or certified mail that he will not be employed for the ensuing fiscal year, and if, by April 25, such teacher has not notified the board of education in writing by registered or certified mail that he does not desire to be reemployed in such school district for the ensuing year, such teacher shall be considered as employed on a continuing contract basis and on the same salary schedule used for other teachers in the school district for the ensuing fiscal year, and such employment and continuing contract shall be binding on the teacher and on the school district.

70 Okl.Stat. § 6–101 D provides in part:

Whenever any person shall enter into a contract with any school district in Oklahoma to teach in such school district the contract shall be binding on the teacher and on the board of education until the teacher legally has been discharged from his teaching position or released by the board of education from his contract.

■■■ Defendant school board acted in conformity with the statutory law of Oklahoma as set forth above when it entered into a written contract with June Murphy on April 25, 1975. There was no indication at that time, whatsoever, that plaintiff,

who had permanently resigned just a month ago, had any intention to return to teach during the 1975/76 school year. For all defendant knew plaintiff was in the Air Force to stay. There existed no basis for any assumption to the contrary and any such assumption would have been clearly unsupported and unreasonable under the circumstances then known to defendant. Defendant certainly was not under any duty to apprise itself of plaintiff's progress in officer training school, and Dr. Skelton would have considered himself derelict in his duties as superintendent had he not contracted with June Murphy, a qualified mathematics teacher, for the following school year.

Plaintiff as well as defendant rely on *Kay v. General Cable Corp.*, 144 F.2d 653 (3d Cir. 1944), as an authoritative interpretation of the phrase in the Act excusing an employer from his affirmative duty to reinstate a returning veteran if the employer's circumstances have so changed as to make it impossible or unreasonable to do so. The Third Circuit stated in *Kay*:

> The change in circumstances upon which the defendant grounded its refusal was this:
>
> In addition to his position with the Company, the plaintiff had been engaged as physician for an employees' Health Association, each member of which paid a monthly premium. The plaintiff received a certain fee per month for each member, for which he was to give the members medical treatment for ills not connected with compensable injuries, which were the subject matter of his employment with the Company. When the plaintiff went into the Army the Health Association employed another physician. Upon his return the Association declined to reemploy the plaintiff, preferring the new man.
>
> The position of the defendant is that it makes for greater efficiency and avoids some loss of the workers' time to have the same physician for both the Company and the Health Association. There is also a faint suggestion that the plaintiff had for some reason become unacceptable to the Health Association, but there is no evidence whatever of a change in his personal relations with the Company and it is not suggested that his professional qualifications, his mental or physical ability to do the work or his personal characteristics had altered in any way, or that the Company had any reason to believe that his services as medical director would be in any way different or less satisfactory than they were before he left.
>
> The Act says, unless the "employer's" circumstances have changed. Primarily, no doubt, this was intended to provide for cases where necessary reduction of an employer's operating force or discontinuance of some particular department or activity *would mean simply creating a useless job in order to reemploy the plaintiff.* Without deciding whether a change in the returned soldier's relations with other employees or with third parties generally can ever constitute a change in the "employer's" circumstances within the meaning of the Act, and assuming that the refusal of the Association to reemploy him is a relevant fact, we are of the opinion that there was no change in this case which would make it unreasonable for the defendant to reengage the plaintiff.
>
> Accepting the defendant's contention that there would be some loss of efficiency and possibly some additional expense involved, more than that is needed to justify refusal to reinstate a person within the protection of the Act. In most cases it is possible to give some reason for the refusal. "Unreasonable" means more than inconvenient or undesirable. The defendant's argument upon this point, if carried to its necessary conclusion, would defeat the main purpose of the Act and limit its operation to merely capricious or arbitrary refusals. Men and women returning from military service find themselves, in countless cases, in competition for jobs with persons who have been filling them in their absence. Handicapped, as they are bound to be by prolonged absence. Handicapped, as they are bound to be by prolonged absence, such competi-

tion is not part of a fair and just system, and the intention was to eliminate it as far as reasonably possible. The Act intends that the employee should be restored to his position even though he has been temporarily replaced by a substitute who has been able, either by greater efficiency or a more acceptable personality, to make it desirable for the employer to make the change a permanent one. (Emphasis added).

144 F.2d at 655–56. Defendant in the instant case did not decline to reemploy plaintiff because it preferred his replacement as did the defendant in *Kay*. Nor can it be said that reinstatement of plaintiff would have been merely inconvenient or undesirable to defendant. Instead it would have meant the creation of a useless job. *See Featherston v. Jersey Central Power & Light Co.*, 161 F.2d 1000 (3d Cir. 1947), *aff'g*, 66 F.Supp. 882 (D.N.J.1946). And, the court cannot conclude that the defendant in the case at bar "completely ignored its lawful obligation to re-employ the applicant," *Watkins Motor Lines v. De Galliford*, 167 F.2d 274, 275 (5th Cir. 1948), but it appears instead, that defendant made a good faith effort to reemploy plaintiff as soon as it was possible and reasonable to do so under the circumstances. *Cf. Featherson v. Jersey Central Power & Light Co.*, 66 F.Supp. 882, 885 (D.N.J.1946), *aff'd*, 161 F.2d 1000 (3d Cir. 1947).

To be sure, a veteran's right to reemployment cannot be defeated by entering into inconsistent contractual obligations with a third party. *Moe v. Eastern Air Lines, Inc.*, 246 F.2d 215, 221 (5th Cir. 1957), *cert. denied*, 357 U.S. 936, 78 S.Ct. 1380, 2 L.Ed.2d 1550 (1958); *Trusteed Funds, Inc. v. Dacey*, 160 F.2d 413, 420 (1st Cir. 1947); *United States ex rel. Stanley v. Wimbish*, 154 F.2d 773 (4th Cir. 1946); *Salter v. Becker Roofing Co.*, 65 F.Supp. 633, 636 (M.D.Ala.1946). However, defendant in the instant case entered into the contract with June Murphy in good faith and without any intention of circumventing the Act. It was not a matter of preference, or of wanting to make the change permanent. And this court cannot conclude on this record that defendant was either obligated to fire June Murphy and thereby breach its contract to her in order to make a place for plaintiff *or* was obligated to hire plaintiff and pay him a salary derived from state and local tax funds when there was no class to be taught.

Defendant fulfilled its obligation under the statutory law of Oklahoma and acted in good faith in employing June Murphy. Defendant's good faith is demonstrated by its actions in response to plaintiff's request for reinstatement. It assured plaintiff that he would be reinstated as soon as possible and no later than at the beginning of the following school year. It offered plaintiff the first position which became available albeit a parttime position, and it was ready to discharge June Murphy, a fully qualified mathematics teacher, and reemploy plaintiff in 1976/77 in recognition of its duty under the Act. These are not the actions of an employer attempting to evade the Act, but to the contrary, these actions demonstrate a good faith attempt to comply with the provisions of the Act.

Nor is this a case involving the "bumping" of employees with respect to seniority because of a returning veteran. *See Muscianese v. United States Steel Corp.*, 354 F.Supp. 1394, 1402 (E.D.Pa.1973). Rather, the facts present in the instant case warrant the conclusion that there existed changed circumstances sufficient to invoke the exception under the Act. Unreasonable is not synonymous with impossible. Thus, while it may not have been impossible to reinstate plaintiff immediately upon his request, it certainly was unreasonable to do so. To conclude otherwise under the facts of this case would render the word "unreasonable," as set forth in the Act, totally devoid of meaning. This the court refuses to do.

Since the defendant was faced with an unreasonable situation within the meaning of the Act and since defendant in good faith discharged its obligations under the Act plaintiff cannot recover. Judgment will be entered in conformity herewith.