**Ronald W. BANKSTON, Plaintiff,**

v.

**STRATTON–BALDWIN COMPANY, INC., Defendant.**

**Civ. A. No. 77–65–P.**

United States District Court, S. D. Alabama, S. D.

Nov. 28, 1977.

---

Vincent F. Kilborn, Mobile, Ala., for plaintiff.

Frank B. McRight, Mobile, Ala., Baldwin, Haspel, Rainold, Meyer, Reso, Dussom & Little, New Orleans, La., for defendant.

## OPINION AND ORDER

PITTMAN, Chief Judge.

This claim was filed under the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 2021, *et seq.* (Veterans' Reemployment Rights). The plaintiff at the time of his discharge was a salesman for the defendant and a member of an Air Force Reserve Unit. He contends he was discharged by the defendant in violation of 38 U.S.C. § 2021(b)(3) which makes it unlawful for an employer to discharge a reservist because of his military obligations. The defendant contends the plaintiff was discharged because of "poor sales" and "bad attitude" and the dismissal had nothing to do with his pending military obligation, a two-week summer training period.

## FINDINGS OF FACT

At pretrial the following facts were admitted:

"1. Jurisdiction of this Cause under [38 U.S.C. § 2021,] et seq., is admitted;

2. The Plaintiff applied for employment with the Defendant by Application dated October 1, 1973;

3. The Plaintiff began work with the Defendant as an office clerk on October 8, 1973;

4. The Plaintiff began selling carpet and vinyl floor covering products for the Defendant on or about October 28, 1974. This selling was for two days a week in the Mobile Territory, which is # 92. The Plaintiff would work in the Defendant's Mobile office the balance of the time;

5. On January 1, 1975, the Plaintiff was given the full time position of carpet and vinyl floor salesman. The Plaintiff's rate of pay was $720.00 per month plus a sales commission of 2% of gross sales. Of the $720.00 per month received by the Plaintiff, $220.00 was for expenses;

6. The Plaintiff was assigned to Territory # 03, which territory encom-

passes the southern part of Mississippi. The Plaintiff's job consisted of selling the Defendant's carpet and vinyl floor covering to retail outlets. Plaintiff retained Territory # 92 in Mobile;

7. On June 16, 1975, the Plaintiff was issued orders from the United States Air Force Reserve to report for summer camp active duty at Maxwell Air Force Base on July 19, 1975 through August 2, 1975. The Plaintiff served this duty;

8. The Plaintiff was discharged from employment with the Defendant on July 15, 1975 by his Supervisor, Mr. Jim DeWitt, upon orders from Mr. Joseph Weigand, the Defendant's Vice-President of Floor Covering stationed in New Orleans, Louisiana.

9. The Plaintiff's termination was confirmed by letter dated July 16, 1975 from Jim DeWitt to the Plaintiff;

10. The Plaintiff was paid by the Defendant through July 31, 1975.

11. The Plaintiff received an Honorable Discharge from the United States Air Force Reserve on February 8, 1977."

The court finds the defendant's home office is in New Orleans. Its outlying sales territory is divided into numbered areas. Territory # 92 covered the greater Mobile area and was served principally by a salesman other than the plaintiff. After October, 1974, the plaintiff had acquired some new customers in Territory # 92 whom he was permitted to continue serving in addition to his designated sales area of Territory # 03.

At all times pertinent to this cause the plaintiff was 22 years of age. He started with the defendant company as an office clerk in late 1973 and it is uncontroverted that the quality of his work in this capacity was good.

The two sales territories of Greater Mobile # 92 and Southern Mississippi # 03 were initially entered by the defendant company in 1973. The first salesman for Territory # 03, Mr. William Covert, left the company in mid-1974. Covert also worked Territory # 15 which included Baton Rouge, Louisiana, and an adjacent area. His total sales for # 03 and # 15 were $105,536.05. Territory # 03 was dormant for approximately one month following Covert's departure except for a hardware salesman employed by the defendant. The hardware salesman covered the area during the hiatus until the plaintiff took sales responsibility for the territory. The territory was unproductive and considered a "dog."

The general company policy was to pay a salesman by commission at the rate of four percent of his gross sales out of which the salesman was to bear his own expenses, including the operating costs of an automobile. Because of the plaintiff's inexperience and the unproductive nature of the territory assigned, a salary arrangement that provided for travel expenses plus two percent of gross sales was established by the defendant. The defendant contends the arrangement was intended to last for six months and, in any event, it is averred, half a year would have been a reasonable period. The court finds there was no fixed termination point for this arrangement, but a reasonable period would be that the plan would last for one year at the end of which the plaintiff would revert to a straight four percent commission on gross sales without any salary or expenses guaranteed. The defendant contends the sales and prorated cost to the company attributable to the plaintiff were negatively disproportionate vis-a-vis the defendant's other salesman much to the detriment of the defendant. The company further contends the plaintiff failed to sell and display product samples to a much greater degree than other salesmen. At trial, witness for the defendant alleged the plaintiff had a "bad attitude," i. e., a negative approach to his work, which accounted for his discharge. Although these circumstances had been investigated by the U. S. Department of Labor, this allegation was the first such contention of a "bad attitude" as the basis for dismissal of the plaintiff.

Plaintiff's sales for the seven-month period prior to his termination demonstrated a substantial sales increase in his sales territory from $2,765.85 [1] in January of 1975, to $8,252.20 in July, 1975. Such a precipitous rise in sales during the "off" season evidences that Bankston's performance was substantially better than the record of the previous salesman for the same area which indicated static or declining sales.

As with most businesses, sales in the floor covering industry are somewhat seasonal. The maximum sales level in the defendant's business generally occurs from late summer through Christmas. The plaintiff's successor, Bill Patrick, had most of this boon season and yet did not appreciably increase the sales in the latter part of 1975. (See Plaintiff's Exhibit 3.)

As for the defendant's charge that the plaintiff failed to move his sample wares, this court finds that the defendant's other salesmen, including one of their most seasoned and productive salesmen, Mr. Grant Baker, experienced similar difficulties with reference to sample sales.

The defendant was informed of the plaintiff's military obligation at the time he was employed in his application for employment. (See admitted facts, *supra.*) While serving as a clerk for the defendant company in 1974, Bankston's two-week military obligation in the summer was satisfactorily arranged with the defendant and was completed without difficulty.

The court finds that outside salesmen in the employ of the defendant were entitled to a two-week vacation each year. However, company policy encouraged salesmen not to take a full week or two weeks vacation, but to take their vacation throughout the year in "days." The purpose of such a method was to minimize the decrease in sales which a week or two-week absence would likely bring about. Other salesmen had experienced difficulty with the company when they took, or attempted to take, their vacation or leave for an extended period of time.

Early in 1975 the plaintiff advised the defendant's Mobile Office Manager of an impending military obligation that was to be fulfilled sometime in the coming summer. In the middle of June, the plaintiff advised the local Office Manager that he had received his orders for a fifteen-day military training period beginning July 19, 1975. (See Plaintiff's Exhibit # 8.) The Office Manager did not have authority to approve or disapprove the absence of the plaintiff. The defendant sales department was informed of this military obligation.

Four days prior to the date plaintiff was to begin his military obligation, he was informed in a phone conversation with Branch Manager J. R. DeWitt, that he had been fired, no reason given. The discharge was reduced to writing by DeWitt on July 16, 1975. Again, no reason for the termination was articulated. (See Plaintiff's Exhibit # 9). The court finds the plaintiff was discharged because of the fifteen consecutive days' absence from employment engendered by his annual military obligation.

### Damages

■ The plaintiff is to be reinstated as an employee of the defendant with the same territory in # 92 and # 03 he possessed at the time of his discharge. He is to receive the same salary of $720.00 per month ($220 for expenses), plus a sales commission of 2% of gross sales for a period of five months since the plaintiff has been denied continuous sales experience for the full one-year period found by the court as reasonable and necessary for a novice salesman to establish himself. It would be inequitable to return Mr. Bankston to the same territory on a straight percentage basis before the completion of a training period deemed fair by this court.

Although the plaintiff was responsible for a more than three-fold increase in sales

---

1. This figure reflects Bankston's sales in both Territory # 03 and Territory # 92. Although the parties were unable to isolate the January 1975 Territory # 03 sales, this amount is still a valid factor in this court's analysis.

from the time he started on a full-time basis on January 1, 1975, until he was fired, this growth level of sales does not reflect a true picture of the anticipated sales development in Territory # 03. Since the sales territory was quite vulnerable in terms of prospective sales for Stratton-Baldwin due to the neglect of the plaintiff's immediate predecessor, Mr. Covert, a continuing, large percentage increase could not be logically projected over the period of time subsequent to the plaintiff's dismissal. This court has determined the damages for the remaining five months of 1975 after the plaintiff's discharge (August through December), to be $720.00 per month plus a two percent (2%) commission on the gross sales in Territory # 03 and Territory # 92. The 1975 damages figure for # 03 is based upon the sales performance of Mr. Patrick, the plaintiff's successor. The figure for # 92 is based upon projected earnings formulated through employment of the plaintiff's five-month sales made between February and June of 1975. The latter computational scheme was necessitated by the unique sales arrangement Bankston enjoyed in # 92 which does not afford a readily ascertainable sales figure since no salesman succeeded to the plaintiff's particular customers alone in Territory # 92. Thus, for the remainder of 1975 the plaintiff should receive damages of $4,636.70 [$720.00 x 5 months plus $775.36 (# 03 commission of 2%) plus $261.34 (# 92 commission of 2%).

For the year 1976, the plaintiff should recover damages on a straight four percent commission basis since such an arrangement would have ensued following the completion of the reasonable training period if the plaintiff had not been fired. For Territory # 03, Mr. Patrick's actual 1976 annual gross sales of $251,808.24 have been used for computational purposes. As for Territory # 92, the court has projected a full year's gross sales of $31,360.80 for 1975 based on the five-month total available for 1975 of $13,067.00 and then added a reasonably anticipated sales increase of ten percent (10%) in order to adjust the total to accommodate gains that should naturally flow after a year's experience. When the four percent commission level is applied to both territories, the 1976 damages figure comes to $11,452.21 ($10,072.33 for # 03 and $1,379.88 for # 92).

Damages for the first eight months of 1977 have been calculated for Territory # 03 by again using Mr. Patrick's gross sales from January through August of 1977 of $204,748.20 as a yardstick while for # 92 another ten percent increase in sales has been applied to the 1976 computation with the four percent commission as a salary basis, the damages for the first two-thirds of 1977 amount to $9,201.84 ($8,189.93 for # 03 and $1,011.91 for # 92).

All in all, the plaintiff's salary damages from August 1975 through August 1977 equal the total figure of $25,290.75. Various expenses would have been incurred by the plaintiff in the field, especially costs involved with the use of an automobile. This court has determined that the award of damages to the plaintiff should reflect the burden of these expenses that the plaintiff would have borne as a salesman of the defendant. Employing the $220.00 amount designated by the defendant in the training period salary agreement with the plaintiff as a reasonable monthly expense figure and applying it over the August 1975—August 1977 term that the plaintiff was denied rightful employment, this court has calculated that $5,500.00 should be subtracted from the damages above ascertained to present a true determination of the plaintiff's loss. After this deduction the damages amount to $19,790.75. Additionally, there are other factors that must be accounted for in arriving at the sum total of damages to which the plaintiff is entitled.

The plaintiff has held various positions of employment since his dismissal by the defendant in mid-1975. His total earnings from these temporary sources of income have amounted to $7,864.83 (a breakdown of this total by employer, year, and total earnings reveals: Protective Services, 1976, $110.00; Professional Security, 1976, $148.20; Otasco, 1976, $154.10; International Paper, 1976, $1,703.69; International Pa-

per, 1977, $2,498.84; Handy City, 1977, $3,250.00). Those earnings secured by the plaintiff over the last two years should be credited against the lost salary and commissions awarded him. Thus, $7,864.83 must be subtracted from the previous subtotal of $19,790.75 in the damages calculation which leaves $11,925.92.

Due to the fact that the plaintiff did not enjoy the medical benefits afforded employees of the defendant during the time after his unlawful discharge, Mr. Bankston has demanded the recovery of damages incurred by medical expenses over approximately the last two years. The plaintiff has paid $1,421.13 in medical expenses since his firing. (This amount is based on the following charges: plaintiff's broken toe—$140.00 doctor bill, $643.13 hospital bill; wife's medical bill—$100.00 doctor bill, $63.00 emergency room fee; wife's pre-natal care in 1977, $475.00). The plaintiff should be reimbursed for those medical bills that the defendant-employer's medical coverage for employees would have met had not the plaintiff been removed from the company's payroll in violation of federal law. When these damages are added to the on-going total, the plaintiff's damages equal $13,347.05.

It has been determined that the plaintiff owes an outstanding balance of $1,282.62 to the defendant's credit union based upon an automobile purchase loan contracted for prior to the plaintiff's leaving Stratton-Baldwin. It has been agreed between the parties that this obligation will be charged against the plaintiff's award to create the final sum of recoverable damages of $12,064.43.

## CONCLUSIONS OF LAW

Since before the Second World War, Congress has propounded legislation to protect individuals whose jobs have been interrupted due to the exigencies of wartime or in support of the nation's peacetime defense forces. Those laws have endeavored to restore persons who have fulfilled their military obligations to their former statuses as civilian employees.

"The original statute establishing Veterans' reemployment rights was the Selective Training and Service Act of 1940, 54 Stat. 885. The name of the Act was changed in 1948 to the Selective Service Act of 1948, 62 Stat. 604, and again in 1951 to the Universal Military Training and Service Act, 65 Stat. 75. In 1967 the Act was renamed the Military Selective Service Act, 85 Stat. 348, and found at 50 U.S.C. App. § 459. The reemployment provisions of the Military Selective Service Act were codified in 1974 with nonsubstantive wording changes in the Vietnam Veterans' Readjustment Act of 1974, 88 Stat. 1578, 38 U.S.C. § 2021 et seq. The reemployment provisions of the various Acts are substantially identical. Thus the judicial precedents developed under them are largely interchangeable."

*Hanna v. American Motors Corp.,* 557 F.2d 118, 119 n.1 (7th Cir. 1977).

Members of the reserve division of the armed forces occupy no inferior status in terms of the employment protective statutes detailed above. The law specifically states at 38 U.S.C. § 2021(b)(3) (1974):

"Any person who holds a position . . . [in the employ of a private employer] shall not be denied retention in employment or any promotion or other incident or advantage of employment because of any obligation as a member of a Reserve component of the Armed Forces."

Due either to the patriotism of employers with reservist employees or the reluctance of wrongfully discharged reservists to press rightful claims, there is a paucity of cases wherein employees with reserve commitments have been denied their reemployment rights. This court has been unable to find a case where a reservist was wrongfully discharged from his job solely because of his short-term military obligation. Most of the cases under these statutes have dealt with veterans who were forbidden seniority or other attendant job benefits due to their absence through national service. *See, e. g., Alabama Power Co. v. Davis,* 431 U. S. 581, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977).

Despite the dearth of cases in the area relevant to the instant case, the intent of the pertinent legislation is unequivocal and not questioned by this court. "[T]here is an unmistakable Congressional intent to protect reservists from being disadvantaged in employment merely because of their status as members of the armed services." *Woods v. Covington County Bank,* 537 F.2d 804, 811 (5th Cir. 1976). Such an "intent to protect the civilian occupations of reservists is evident in [38 U.S.C. § 2021(b)(3)] . . ." *Id.* at n.8.

A further examination of the legislative history of 38 U.S.C. § 2021(b)(3) provides greater evidence on the purpose of the provision in the context of the case *sub judice.* A Senate report declared that "[t]his bill is intended . . . to prevent reservists . . . who must attend . . . summer training from being discriminated against in employment because of their Reserve membership . . . ." *U.S.Code Cong. & Admin.News,* 90th Cong., 2d Sess. 1968, vol. 3, p. 3421, S.Rep. No. 1477. The counterpart report from the House stated that the subsection "assures that these reservists will be entitled to the same treatment as their co-workers without such military obligation." House Rep. No. 1303, 90th Cong., 2d Sess., at 3 (1968).

This court has determined that the defendant's action was predicated upon the perceived inconvenience engendered by the plaintiff's military commitment. Clearly the defendant's conduct was proscribed by the laws of the United States when it dismissed the plaintiff in the summer of 1975.

Congress added teeth to its statutory protection for veterans' jobs with the enforcement procedures of 38 U.S.C. § 2022 which read:

"If any employer, who is a private employer . . . fails or refuses to comply with the provisions of . . . [section 2021(b)(3)], the district court of the United States for any district in which such private employer maintains a place of business . . . shall have the power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, specifically to require such employer to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action. Any such compensation shall be in addition to and shall not be deemed to diminish any of the benefits provided for in such provisions."

■ Through the judicial powers created by § 2022, this court has determined that damages for the plaintiff are warranted under the circumstances. The appellate courts have stated that "[a]lthough an award of damages is within the discretion of the court, the Act is to be construed liberally so as to benefit the veteran. [citation omitted]. As the Supreme Court has stated, '[h]e is not to be disadvantaged by serving his country.' *McKinney v. Missouri-Kansas Texas R.R. Co.,* 357 U.S. 265, 270, 78 S.Ct. 1222, 1226, 2 L.Ed.2d 1305 (1958)." *O'Mara v. Petersen Sand & Gravel Co.,* 498 F.2d 896, 898 (7th Cir. 1974). The Fifth Circuit has elaborated upon § 2022 in terms of an incorrect reinstatement of a veteran, but the language is clearly analogous and provides assistance to the court in fashioning appropriate relief. The Fifth Circuit declared:

"The rule of full compensation has sometimes been formulated as giving the veteran the difference between the earnings he would have had in the slot in which he should have been reemployed and what he actually earned in the lesser job. . . . A more inclusive formulation, drawn from the legislator's overall purpose [evident in § 2022], is that the veteran should be made whole, and reimbursed for the measurable wage disadvantage or loss suffered through his incorrect reinstatement."

*Helton v. Mercury Freight Lines, Inc.,* 444 F.2d 365, 367 (5th Cir. 1971). It takes no great effort to relate the import of the above quoted passage to the present situation of a reservist denied the right to briefly serve his country and then return to his former position. In the event that a reserv-

ist is denied that right, as here, a damage award is dictated if the statutes are to have meaning and force. This plaintiff deserves to be "made whole."

It is therefore ORDERED, ADJUDGED and DECREED that judgment is for the plaintiff and against the defendant in the amount of $12,064.43 in damages.

The plaintiff has thirty (30) days from the date of this decree to give the defendant written notice of his decision to return to work *vel non* under the conditions set out in this order. The defendant is given two weeks to comply in the event the plaintiff chooses to return to the employ of the defendant. Furthermore, the defendant, its officers, agents, servants, employees, and those persons in active concert or participation with it, are ENJOINED from failure to offer the plaintiff his former position and former sales territory under the guidelines set down by the court above.

All costs are taxed to the defendant.