TRINITY SERVICES, INC., a Florida
Corporation, et al.,

v.

F. Ray MARSHALL, Secretary of Labor,
et al., Appellants.

No. 77–1217.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 30, 1978.

Decided Dec. 27, 1978.

Michael F. Hertz, Atty., Dept. of Justice, Washington, D. C., with whom Earl J. Silbert, U. S. Atty., Leonard Schaitman, Atty., Dept. of Justice, Donald S. Shire, Associate Sol., and Eric Schwartz, Atty., Dept. of Labor, Washington, D. C., were on the brief, for appellants.

Albert Millar, Jr., Jacksonville, Fla., a member of the bar of Supreme Court of Florida pro hac vice, by special leave of Court with whom Gordon P. MacDougall, Washington, D. C., was on the brief, for appellee, Trinity Services, Inc.

Malcolm A. Goldstein, New York City, with whom Gerald I. Sommer, Washington, D. C., was on the brief, for appellee, Transport Workers Union of America, AFL–CIO, et al.

Asher W. Schwartz, New York City, entered an appearance for appellee, Transport Workers Union of America et al.

Before LUMBARD,* Senior Circuit Judge for the Second Circuit, and MacKINNON and WILKEY, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

Dissenting opinion filed by Senior Circuit Judge LUMBARD.

MacKINNON, Circuit Judge:

The issue in this case is whether severance and seniority provisions are *bona fide* fringe benefits required to be included in wage determinations issued by the Secretary of Labor pursuant to the Service Contract Act of 1965, 41 U.S.C. § 351 *et seq.*

## I. THE STATUTE

The Service Contract Act requires the inclusion of specific provisions in every contract entered into by the United States in excess of $2500 (with certain exceptions not applicable here)[1] "the principal purpose of which is to furnish services in the United States through the use of service employees."[2] A contract subject to the § 351(a) requirements must contain, for example, "a provision specifying the minimum monetary wages to be paid the various classes of service employees in the performance of the contract or any subcontract thereunder."[3] This amount is to be determined by the Secretary of Labor "in accordance with prevailing rates for such employees in the locality, or, where a collective bargaining agreement covers any such service employees, in accordance with the rates for such employees provided for in such agreement, including prospective wage increases provided for in such agreement as a result of

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. *See* 41 U.S.C. § 356.

2. 41 U.S.C. § 351(a).

3. 41 U.S.C. § 351(a)(1). Other provisions mandated by 41 U.S.C. § 351(a) are: (a) "a provision specifying the fringe benefits to be furnished the various classes of service employees . . . .," 41 U.S.C. § 351(a)(2); this provision is the focus of the litigation, and is discussed in detail in the remainder of the opinion; (b) a provision prohibiting the rendering of services in unsanitary or hazardous working conditions, 41 U.S.C. § 351(a)(3); (c) a provision requiring the contractor or subcontractor to furnish the employee a notice of compensation, 41 U.S.C. § 351(a)(4); and (d) a statement of rates that would be paid by the Federal agency, 41 U.S.C. § 351(a)(5).

arm's length negotiations."[4] In no event can these "minimum monetary wages" be lower than the federal minimum wage.[5]

This case focuses on the Act's requirement that all service contracts covered by the Act include a provision specifying the fringe benefits to be furnished the various classes of service employees. This subsection requires that a contract covered by the Act contain:

> (2) A provision specifying the fringe benefits to be furnished the various classes of service employees, engaged in the performance of the contract or any subcontract thereunder, as determined by the Secretary or his authorized representative to be prevailing for such employees in the locality, or, where a collective-bargaining agreement covers any such service employees, to be provided for in such agreement, including prospective fringe benefit increases provided for in such agreement as a result of arm's-length negotiations. Such fringe benefits shall include medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, unemployment benefits, life insurance, disability and sickness insurance, accident insurance, vacation and holiday pay, costs of apprenticeship or other similar programs and other bona fide fringe benefits not otherwise required by Federal, State, or local law to be provided by the contractor or subcontractor. The obligation under this subparagraph may be discharged by furnishing any equivalent combinations of fringe benefits or by making equivalent or differential payments in cash under rules and regulations established by the Secretary.

41 U.S.C. § 351(a)(2). This section must be read with a 1972 amendment which provides that no contractor who succeeds to a contract subject to the Act and provides substantially similar services shall pay any service employee less than the wages and fringe benefits to which he would have been entitled if employed under the predecessor's contract. This part of the Act provides:

> (c) No contractor or subcontractor under a contract, which succeeds a contract subject to this chapter and under which substantially the same services are furnished, shall pay any service employee under such contract less than the wages and fringe benefits, including accrued wages and fringe benefits, and any prospective increases in wages and fringe benefits provided for in a collective-bargaining agreement as a result of arm's-length negotiations, to which such service employees would have been entitled if they were employed under the predecessor contract: *Provided,* That in any of the foregoing circumstances such obligations shall not apply if the Secretary finds after a hearing in accordance with regulations adopted by the Secretary that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality.

41 U.S.C. § 353(c).

■ It was the intent of Congress that the Secretary of Labor make determinations of the minimum monetary wages and fringe benefits for the various classes of service employees working under contracts covered by the Act.[6] Thus, any wage determination issued must contain the wage and fringe benefit provisions of any collective bargaining agreement between the incumbent employer and any union representing the service employees to the extent that sections 351(a)(1) and 351(a)(2) require their inclusion. The successor contractor must pay the wages and provide the benefits unless "the Secretary finds after a hearing . . . that such wages and fringe benefits are substantially at variance with those which prevail for services of a character

---

**4.** 41 U.S.C. § 351(a)(1).

**5.** 41 U.S.C. § 351(b)(1).

**6.** 41 U.S.C. § 358.

similar in the locality."[7] The Secretary is also empowered to "provide such reasonable limitations and . . . make such rules and regulations allowing reasonable variations, tolerances, and exemptions" from the provisions of the Act, "but only in special circumstances where he determines that such limitation, variation, tolerance, or exemption is necessary and proper in the public interest or to avoid the serious impairment of government business, and is in accord with the remedial purpose of this chapter to protect prevailing labor standards."[8] The Secretary of Labor has also issued regulations to implement the Act.[9]

## II. BACKGROUND

The material facts of this case are not disputed. Trinity Services, Inc. ("Trinity") is a service contractor holding two janitorial service contracts, one at Patrick Air Force Base and the other at Cape Canaveral Air Force Station. To perform these contracts, Trinity employed members of the Transport Workers International Union ("TWIU") and Service Employees International Union ("SEIU"), and entered into collective bargaining agreements with their respective locals. Trinity's contracts were due to expire on November 30, 1976; therefore, the Air Force filed with the Department of Labor notices of its intentions to enter into new contracts.[10] On October 22, 1976, in accordance with these notices and 29 C.F.R. § 4.3,[11] the Department of Labor issued Wage Determination No. 73–794 for the Patrick Air Force Base contract[12] and Wage Determination No. 73–535 for the Cape Canaveral contract.[13] The Secretary's wage determinations, as required by the Act, specify the minimum monetary wages and fringe benefits to which all bid and contracts accepted by the Government must conform.

The services to be furnished under the new contracts for which bidding was opened would be substantially the same as the services previously being performed by Trinity. The wage rates and fringe benefits paid by Trinity to its service employees were contained in the two collective bargaining agreements entered into on August 13, 1976 between Trinity and the two unions.[14] Thus, according to the statute and the applicable regulations,[15] the Secretary was required to issue wage determinations for the successor contracts which set forth for the various classes of employees the wage rates and fringe benefits contained in the existing collective bargaining contract, and the wage determinations did include most of the wage and fringe benefits included in the agreements.

This dispute arises primarily because each wage determination excluded a severance pay provision, which required the successor contractor to make a payment to employees of the predecessor contractor which it did not hire:

7. 41 U.S.C. § 353(c).

8. 41 U.S.C. § 353(b).

9. 29 C.F.R. § 4.1 *et seq.* (1977).

10. 29 C.F.R. § 4.4 (1977) requires the contracting agency to file a notice of its intention to make a service contract not less than 30 days prior to any invitation for bids, request for proposals, or commencement of negotiations for any contract exceeding $2500 which may be subject to the Act. The regulation also provides that certain information be included in the notice.

11. 29 C.F.R. § 4.3 (1977) describes the creation and contents of a register of wage determinations. It also sets forth what each wage determination, as required by statute, shall contain.

12. J.A. 7–12.

13. J.A. 13–19.

14. The agreement between Trinity and Transport Workers Union of America, AFL–CIO, Guided Missile [*sic*] Local 525, appears at J.A. 20–45, and the agreement between Trinity and Service Employees International Union, Local 626, AFL–CIO, appears at J.A. 48–76.

The collective bargaining agreement between Trinity and TWIU covers roughly 72 workers with average seniority of 15 years at the Cape Canaveral installation (J.A. 85). The agreement between Trinity and SEIU covers roughly 49 workers with average seniority of 8 years at Patrick Air Force Base (J.A. 92).

15. 41 U.S.C. §§ 351(a)(1), 351(a)(2), 353(c); 29 C.F.R. §§ 4.1c, 4.3.

The provision set forth in Section 10, Article 26 (Severance Allowance), of the predecessor contractors [sic] collective bargaining agreement is deemed outside the perveiw [sic] of the obligations imposed on a successor contractor under Sections (2)a [2(a)] [41 U.S.C. § 351(a)] and 4(c) [41 U.S.C. § 353(c)] of the Service Contract Act.

J.A. 12, 18. The excluded provision of the collective bargaining agreements, Art. 26, § 10, provided as follows:

It is the intention of this Article that any successor to the instant contract, whether it be Trinity Services, Inc. or any other contractor shall be in exactly the same position with respect to severance pay liability for any employees that it may elect to terminate for reasons other than permitted by this Article. The incumbent contractor and its successor shall be deemed the same for the purpose of determining severance pay liability and lose [sic] of the contract to a successor shall not be considered a severance. Conversely, refusal to hire by a successor for reasons other than permitted by this Article shall be considered a severance for which the successor shall be liable.

J.A. 40, 70. Even though the severance pay obligation on a successor employer provision was excluded from the wage determination, the Secretary did include a basic seniority concept:

Where eligibility for a fringe benefit listed herein depends upon an employee's length of service, i. e., severance pay, vacation, etc., credit must be given to an employee's total length of service defined as the whole span of continuous service with the present (successor) contractor wherever employed, or predecessor contractor(s) in the performance of similar work at the Federal facility.

J.A. 12, 18. The wage determination did omit some other specific provisions from the collective bargaining agreements.[16] One of these provisions would require a contractor to forego hiring new workers until all employees of the incumbent with accrued seniority rights who had been laid off and who qualified to do the available work had been offered reemployment.[17]

On October 27, 1976, while competitive bidding for a new contract was underway, Trinity filed suit for declaratory and injunctive relief against both the Secretary of Labor, who is responsible for issuing wage determinations under the Act, and the Secretary of the Air Force, who is ultimately responsible for the issuance of service contracts at Air Force facilities.[18] The two service employees unions were also originally named as defendants, but on order of the district court were realigned as plaintiffs. Plaintiffs, alleging that the wage determinations issued were inconsistent with the Act of 1965 as amended, sought to prohibit bid openings for the two contracts pending issuance of valid wage determination. The basis for this claim was that the severance pay provision of Art. 26, § 10 of both Agreements and certain seniority provisions were wrongfully excluded from the wage determinations without affording plaintiffs opportunity for a hearing.

The district court, treating the papers filed in connection with plaintiffs' motion for a preliminary injunction as cross-motions for summary judgment,[19] on November 24, 1976 entered an order[20] and memorandum opinion[21] enjoining the Secretary of the Air Force from opening bids or awarding new contracts for custodial services at Cape Canaveral or Patrick Air Force Base until valid wage determinations had been issued.[22] In so ruling, the district

**16.** See Art. X of Trinity-TWIU agreement, J.A. 24–25; Art. IX of Trinity-SEIU agreement, J.A. 52–54.

**17.** Art. X, § 5, of Trinity-TWIU agreement, J.A. 25; Art. IX, § 5 of Trinity-SEIU agreement, J.A. 53.

**18.** See J.A. 2–6.

**19.** J.A. 101.

**20.** J.A. 100.

**21.** J.A. 101–05.

**22.** J.A. 105.

court concluded that the wage determinations issued by the Secretary of Labor did not comply with the Service Contract Act.

The district court found that Art. 26, § 10 was a valid fringe benefit in the collective bargaining agreements and was required to be included in the wage determinations issued by the Secretary of Labor.[23] The court acknowledged that the effect of the provisions was to tend to force any successor contractor to retain the predecessor's employees by requiring the successor to hire them or pay them a severance indemnity.[24] Yet the district court found that the severance provision "was bargained for and was not required by statute or regulation" and was "within the expansive conception of 'fringe benefit' contained in the Act."[25] The court determined that the inclusion of the severance provision would further the goals of the Act by eliminating the incentive for successor contractors to refuse to hire senior employees of the predecessor. The court observed that a successor gains a competitive bidding advantage over an incumbent, and contrary to the purpose of the Act, can keep the actual wage paid for custodial work artificially depressed.[26] The court believed that through the severance provision here, the custodial employees "bargained themselves out of this dilemma."[27] The court also referred to certain "seniority rights" that were omitted from the determinations, but it did not explain what those were.[28]

The district court also stated that Congress expected the Secretary of Labor to reject any wage or fringe benefit that was inconsistent with prevailing local standards, and contemplated that such a rejection be made only after a hearing, which was not held in this instance. The court said that before the "severance provision and seniority rights" could be excluded from the wage determination, a hearing must be held and proper findings made in accordance with the statute.[29]

## III.  THE HEARING REQUIREMENT

We turn first to the contention that the Secretary should have held a hearing before determining that Art. 26, § 10 was not a valid fringe benefit.

Section 353(c) provides that the successor's obligations to pay wages and fringe benefits and increases therein shall not apply if the Secretary finds "after a hearing . . . that such wages and fringe benefits are substantially at variance with those which prevail for services of a character similar in the locality." When the Secretary did not include Art. 26, § 10 in the wage determinations, he did not hold a hearing. The district court found this to be error.

■ The purpose of section 353(c)'s variance hearing is to determine the *factual* question of whether a particular fringe benefit or wage is "substantially at variance" with the wages or benefits that prevail in the locality. Before section 353(c) is relevant in any particular case, it must first be determined that the particular benefit or wage in question is a monetary wage within the meaning of section 351(a)(1) or a fringe benefit within the meaning of section 353(a)(2). That Congress intended the variance hearing to operate in this manner is evident from the Senate Committee report on the 1972 amendments:

[S]ervice employees should be protected against instances where the parties may not negotiate at arms length. For example, a union and an employer may enter into a contract, calling for wages and fringe benefits *substantially lower* than the rates presently prevailing for similar services in the locality. Likewise, a union and employer may reach an agreement providing for future increases *substantially in excess of* any justifiable increas-

---

**23.**  J.A. 103.

**24.**  *Id.*

**25.**  *Id.*

**26.**  J.A. 103–04.

**27.**  J.A. 104.

**28.**  J.A. 102, 103, 104.

**29.**  J.A. 104.

es in the industry. Finally, it is possible that over a long period of time, predetermined contractual rates might become *substantially at variance* with those actually prevailing for services of a character similar in the locality.

The committee concluded that the dual objectives of protecting the service worker and safeguarding other legitimate interests of the federal government could be best achieved by requiring the Secretary to predetermine the wages and fringe benefits contained in the collective agreement, except in the instance where he finds, after notice to interested parties, and a hearing, that *the record discloses by a clear showing that such contractual wages and fringe benefits are substantially at variance with those prevailing for services of a character similar in the locality.*

S.Rpt.No.1131, 92d Cong., 2d Sess. 4–5 (1972) (emphasis added), U.S.Code Cong. & Admin.News 1972, pp. 3534, 3537.

The Secretary did not exclude Art. 26, § 10 because it was at variance with the wages or benefits that prevailed in the locality; rather, the provision was excluded because it was not a valid fringe benefit within the meaning of section 351(a)(2). This is a threshold question of law. If Art. 26, § 10—or any excluded seniority provision—is not within one of the categories of fringe benefits listed in section 351(a)(2), the question of the appropriateness of the variance hearing can never arise. Thus, the factual-type hearing contemplated by section 353(c) was not required in this case.

## IV. SECTION 351(a)(2) AND THE SUCCESSOR EMPLOYER'S DUTY TO MAKE A SEVERANCE PAYMENT TO THE PREDECESSOR'S EMPLOYEES

■ Art. 26, § 10, quoted above,[30] provides that if a successor employer does not hire the predecessor's employees, the successor must pay the employees a severance benefit. The district court ruling requiring that Art. 26, § 10 be included in the wage determinations allows an incumbent contractor and its employees, by agreement, to bind a successor contractor to either hiring the predecessor's employees or paying them a severance benefit even though no formal employment relationship between the successor and the employees comes about. It is our view that Art. 26, § 10 of the collective bargaining agreements between plaintiff-Trinity and plaintiff-unions is not a *bona fide* fringe benefit within the meaning of the Service Contract Act.

We first consider the language of the statute. Although "fringe benefit" is not specifically defined in the Act, section 351(a)(2), quoted above,[31] which requires that certain fringe benefits be included in the wage determinations, contains a list of specific fringe benefits. Severance pay obligations are not specifically listed, but the statute does cover "other bona fide fringe benefits not otherwise required by Federal, State, or local law to be provided by the contractor or subcontractor." If Art. 26, § 10 is within the scope of section 351(a)(2), it must fall within the category of "other bona fide fringe benefits."

■ All of the examples of fringe benefits in section 351(a)(2) require the employer who extends such a benefit to his own employees to incur a present cost or the risk of a future cost. That is, to provide the benefit, the employer must make a payment to the employee (or to a fund maintained in the employee's behalf) for the present or future use of the employee (or his beneficiary), allow the employee to accrue some form of deferred compensation (such as vacation time), or incur the risk of granting the benefit to the employee (or his beneficiary) at some future time (such as compensation for injuries or illness from occupational activity).[32] Many examples of bene-

---

30. *See* text at 8, *supra*.

31. *See* text at 3–4, *supra*.

32. The statute also contemplates that many employers have insurance against such risks; such insurance coverage, a present cost, is also

fits can be imagined which involve a present cost or the present risk of a future cost to the employer of the workers. These are "bona fide fringe benefits." [33]

Art. 26, § 10 is not a benefit like the ones which section 351(a)(2) specifically covers. The predecessor employer, by the plain terms of Art. 26, § 10, can never be liable for a payment under that provision of the collective bargaining agreement. No deferred compensation is accrued by the employee at the employer's expense, the employer assumes no risk of ever having to make a payment, and no present payment is made by the employer to the employee or to a fund maintained for the benefit of the employee or his beneficiaries. It is certainly true that Art. 26, § 10 attempts to give the employee a present benefit, for if the successor employer accepts such obligation it provides that employee with a greater amount of employment security: a successor employer is less likely to refuse to hire the predecessor's employees, and it may be more difficult for a competitor even to succeed to the contract. But the present benefit is unlike all of the benefits listed in section 351(a)(2), in that it does not require an incumbent employer to incur any cost with respect to the putative benefit.

Similarly, Art. 26, § 10 differs from the other benefits listed in section 351(a)(2) in that its value to the recipient is incapable of being ascertained in a definite amount whereas the obligations imposed under section 351(a)(2) can be met by making equivalent payments in cash under regulations promulgated by the Secretary. Assigning an equivalent cash value to Art. 26, § 10 would seemingly be impossible. It has no present actual monetary value, and it is incapable of being actuarialized because it is contingent on contract turnover, which is not capable of prediction in any accurate way. All of the other specific benefits in section 351(a)(2) can be given a value. Hence, Art. 26, § 10 is not the type of benefit which is covered by section 351(a)(2).

■ Were we to deem Art. 26, § 10 a fringe benefit within the meaning of the Act, we would violate the apparent meaning of section 351(a)(2). It is a well-settled principle of statutory construction that where specific words precede or follow general words in an enumeration describing a particular subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words. *Weyerhauser Steamship Co. v. United States,* 372 U.S. 597, 600–01, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963); *Fourco Glass Co. v. Transmirra Products Corp.,* 353 U.S. 222, 228–29, 77 S.Ct. 787, 1 L.Ed.2d 786 (1957); *Federal Trade Commission v. Manager, Retail Credit Co., Miami Br. Office,* 169 U.S.App.D.C. 271, 276–77, 515 F.2d 988, 993–94 (1975); *Wedding v. Wingo,* 483 F.2d 1131, 1135 (6th Cir. 1973); 2A *Sutherland Statutory Construction,* § 47.17, at 103 (4th ed. Sands 1973). If Art. 26, § 10 were considered an "other bona fide fringe benefit," then the interpretative principle of *ejusdem generis* would be violated and the statute would be construed contrarily to its apparent meaning.

■■ Our interpretation is bolstered by section 353(c), which states that successor employers shall pay wages and fringe bene-

---

a fringe benefit within the meaning of section 351(a)(2).

**33.** The parties, in attempting to discern what types of benefits are *bona fide* fringe benefits within the meaning of section 351(a)(2), dispute whether the test should be "benefit received" or "cost incurred." Plaintiffs urge us to determine whether the employees "received a benefit"; by this test, Art. 26, § 10 would be a fringe benefit, for the employees do receive a benefit if the successor assumes the liability. However, this reading would embrace many types of benefits not a product of arms length negoti-

ations, *see* text at 1259–1260. Given the policy of the Act to maintain wage and fringe benefit standards that are negotiated at arms length and which do not exceed prevailing standards in the same locality, we think a better standard is whether the employer "incurred a cost." Plaintiffs fail to recognize, however, that a funeral or sick leave provision subjects the employer to a present risk of a cost, as that cost might be incurred at any time. All of the examples in section 351(a)(2) meet the cost incurred test, and we can think of no *bona fide* fringe benefits which do not.

fits "to which such service employees would have been entitled *if they were employed under the predecessor contract.*" A severance pay obligation which matures only if a successor employer takes over the contract and does not rehire the employee [34] is not a fringe benefit to which employees "would have been entitled if they were employed under the predecessor contract." By definition, the employees can never be *entitled* to this benefit under the predecessor contract, because the benefit is paid only if the successor refuses to hire the predecessor's employees. The Act contemplates that a successor employer provides benefits to its employees that the predecessor provided to the predecessor's own employees. There is nothing in the statute which requires a successor to extend benefits to the predecessor's employees absent the formation of an employer-employee relationship between the successor and the predecessor's employees.[35]

The fact that the Art. 26, § 10 "benefit" does not impose any cost upon the incumbent employer raises a second consideration which bolsters our conclusion that Art. 26, § 10 falls outside the scheme of the Act. Section 351(a)(2) does cover future benefits, and it is true that Art. 26, § 10's benefit can only accrue in the future. However, the statute is expressly limited to wage increases or future fringe benefit increases that are a result of "arms-length negotiations."[36] The purpose of this language is clear: it would be a simple matter for an employer who, for example, expects to leave the business at the end of the contract term to promise his employees massive wage increases, full well knowing he will never pay them, in the hope of binding the successor employer for his employees' benefits.[37] The requirement for "arms-length negotiations" is an important ingredient of ensuring that wage rates and fringe benefits are in general accord with those prevailing in the locality.

Art. 26, § 10 contains nothing about which the employer and employee can fruitfully bargain at arm's length. Trinity would *never* have to pay anything under the terms of the provision; no burden whatsoever is imposed on Trinity. Indeed, Trinity is *benefited* by the provision: a competitor bidding for the contract at renewal time would have either to include the costs of making severance payments upon termination of Trinity's workforce in its bid or to base its bid on Trinity's present wage costs if that workforce would be hired. If a competitor intended to hire a less-experienced workforce and thereby reduce wage costs, it would have to make the Art. 26, § 10 payment. This would bring the competitor's projected costs into rough parity with Trinity's. This would work to Trinity's benefit, as its competitive position would be enhanced and it would be better

---

**34.** It is important to distinguish Art. 26, § 10 from a "pure" severance payment obligation. A predecessor employer might incur an obligation to make payments to *its* employees when *it* lays them off. This is payment made at the predecessor's expense. This is a benefit similar to those specifically listed in section 351(a)(2), and is the proper subject of a wage determination. In this case, the severance payment obligation Trinity had toward its own employees was included in the wage determination. *See* J.A. 9–10, 16–17. Thus, the successor employer to Trinity's contract must make severance payments to *its* employees should *it* lay them off. Art. 26, § 10, which requires the successor to make a severance payment should it decline to hire the predecessor's workforce, is completely different from a severance payment obligation an employer has with respect to its own employees.

**35.** *See* note 39 *infra.*

**36.** 41 U.S.C. §§ 351(a)(1), 351(a)(2), 353(c).

**37.** *See Kentron Hawaii, Ltd. v. Warner,* 156 U.S.App.D.C. 274, 480 F.2d 1166 (1973), where Judge Wilkey wrote:

> Enclave wage determinations afford the incumbent contractor an opportunity for "last minute artificial inflating of rates in anticipation of the contract renewal," thereby dampening competition from other possible offerers.

At 287–288, 480 F.2d at 1179–80. While the variance hearing procedure might eventually detect the non-arm's length collective bargaining agreement provision, the inclusion of the statutory language on arm's length negotiation makes Congress' intent clear—only *bona fide* wages and fringe benefits are within the scope of sections 351(a)(1) and 353(c).

able to retain the contract. As for the unions, Art. 26, § 10 would work to the employees' benefit if its terms were imposed on the successor employer. The agreement of Trinity and its employees' unions to require a successor employer to pay a severance benefit to the employees if the successor did not hire them is a classical example of a mutually beneficial arrangement. This is not the type of arrangement that the Service Contract Act as presently written is designed to protect.

[11] Our reading of the Act is also supported by the legislative history. The 1965 House and Senate Committee Reports on the Act clearly demonstrate that the principal purpose of the Act was establishing minimum wage and fringe benefit standards to be provided by the successor employer. The House Report stated:

> This bill is proposed to provide much needed labor standards protection for employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal agencies.

H.R.Rpt.No.948, 89th Cong., 1st Sess. 1 (1965). *Accord,* S.Rept.No.798, 89th Cong., 1st Sess. 1 (1965), U.S.Code Cong. & Admin. News 1965, p. 3737. Nothing in the House or Senate Report suggests that a successor should be required to hire the predecessor's employees, or that a successor should be required to make a payment to the predecessor's employees if the successor did not hire them.

Other language in the reports suggests that the concern of the Congress was upholding minimum standards. The House Report stated:

> Concern over protection for *wage standards* of employees of employers having service contracts with the Federal Government has been expressed by Members of Congress for a number of years.

H.R.Rpt.No.948, *supra,* at 2. Both reports stated:

> Since labor costs are the predominant factor in most service contracts, the odds on making a successful low bid for a

contract are heavily stacked in favor of the contractor paying the lowest wages. Contractors who wish to maintain an enlightened *wage policy* may find it almost impossible to compete for Government service contracts with those who pay wages to their employees at or below the subsistence level. When a Government contract is awarded to a service contractor with low *wage standards,* the Government is in effect subsidizing subminimum wages.

H.R.Rpt.No.948, *supra,* at 2–3; S.Rpt.No. 798, *supra,* at 3–4, U.S.Code Cong. & Admin.News 1965, p. 3739. Both 1965 reports on the Act demonstrate that Congress was concerned with maintaining wage and fringe benefit levels to be provided by the successor employer. This comports with the plain language of the statute. Nothing suggests that Congress intended the plain language to go farther and ensure job continuity.

Section 353(c) of the Act, which requires a successor employer to pay the wages and fringe benefits included in the wage determination, was added in 1972.[38] In discussing this section, both the House and Senate Reports state:

> [Successor] [c]ontractors or subcontractors . . . must pay service employees at least the wages and fringe benefits (including accrued wages and fringe benefits) to which the service employees would have been entitled *had they been employed under the predecessor contract,* as well as any prospective wage and fringe benefit increases provided for in a collective bargaining agreement to which they would have been entitled *had they been so employed,* if the Secretary elects, and if such prospective increases were the result of arm's-length negotiations.

H.R.Rpt.No.92–1251, 92d Cong., 2d Sess. 5 (1972); S.Rpt.No.1131, *supra,* at 3 U.S.Code Cong. & Admin.News 1965, p. 3536. The Reports anticipate that employees under the successor contracts receive the same benefits they would have received if their employment under the predecessor contract

---

**38.** Act of Oct. 9, 1972, Pub.L.No.92-473, § 3, 86 Stat. 789.

had continued. And if the employee was entitled to a benefit upon the termination by the predecessor of the employee-employer relationship during the contract term, the employee would also be entitled under the successor's contract to the same benefit upon termination by the successor during the contract term of the employee-employer relationship. Nothing in the history of the 1972 amendments suggests that these changes in the Act sought to fill the "gap" that exists when an incumbent loses the contract and the successor does not hire the predecessor's employees.[39]

The district court noted that excluding Art. 26, § 10 from the wage determination would allow competitors at the time of the contract's renewal to underbid the incumbent by hiring less experienced and therefore cheaper employees to do the same work. Imposing the severance payment obligation on the successor if the predecessor's work force was not hired would "equalize" the bidding process, in that the competitor placing the bid would have to include as a cost the amounts to be paid to employees of the predecessor not hired. The effective end result of this "equalization" would be to increase job security; even if the incumbent was replaced, an incentive would exist to hire the predecessor's employees.[40]

The district court's analysis is cogent: the Act is designed to protect service employees by preserving the benefits gained under prior employers. It is ironic and unfortunate that the employees may lose their jobs when the incumbent contractor is replaced. The Act preserves many job-related benefits but this may be for naught if the employees cannot keep their jobs. But whatever policy considerations may commend the district court's ruling, we cannot alter the plain language of the Act which does not cover this type of severance-pay benefit in the wages and benefits when the obligation is one that must be paid by the successor employer and he has not agreed thereto. Indeed, it may be that Congress chose to recognize the employer's interest in choosing his own work force. *Howard Johnson, supra,* 417 U.S. at 261, 94 S.Ct. 2236; *Burns, supra,* 406 U.S. at 280 n.5, 92 S.Ct. 1571. If Congress intended that the Act enhance employment security, it would have been a simple enough matter to write the statute accordingly.[41] While the disadvantages of not including a severance-pay benefit such as Art. 26, § 10, as discussed by the district court, may be prominent, we find no indication in the plain language of the statute or the legislative history that Congress intended the Act to reach that far.

**39.** A corollary of this conclusion is that the Act does not require a successor to hire the predecessor's work force. *Service Employees' International Union v. General Services Administration,* 443 F.Supp. 575 (E.D.Pa.1977). The quoted portions of House Report No. 92–1251 and Senate Report No. 1131 which appear in the text *supra* clearly show that Congress contemplated that a successor contractor might not employ the predecessor's work force. In floor debate, Congressman Ben B. Blackburn stated in opposition to the bill that the obligations imposed by section 353(c) apply "even if the successor contractor employs his own work force and does not retain any of the predecessor contractor's employees." 188 Cong.Rec. 27139 (1972). *See* Subcommittee on Labor-Management Relations of House Committee on Education and Labor, Congressional Oversight Hearings: The Plight of the Service Worker Revisited 8–9 (April, 1975); Problems of Service Contract Act and Protection of Florida Cape Area Workers: Hearings before the Federal Spending Practices, Efficiency, and Open

Government Subcommittee of the Senate Committee on Government Operations, 94th Cong., 2d Sess. 3 (1976) (statement of Kenneth L. Woodfin, Assistant Administrator for Procurement, National Aeronautics and Space Administration).

**40.** J.A. 103–04.

**41.** In our opinion, it seems clear that the unions, by Art. 26, § 10, are attempting to create an employment relationship between its employees and the successor. The Act does not require that this relationship be preserved. *See* note 39 *supra.* This, however, is not the specific question presented to the court. We are asked to decide whether certain collective bargaining agreement provisions are "fringe benefits" within the meaning of the Act. It is difficult, however, to view these questions separately: if the Act provided for continuity of employment, this case would not have been presented to us.

## V. OTHER SENIORITY RIGHTS

The district court held that the Secretary erred in not including certain "seniority rights" in the wage determination, but the court did not specifically state what these rights were. Memorandum Opinion, at J.A. 102, 103, 104. We assume that the court was referring to certain provisions in articles of the collective bargaining agreement entitled "Seniority and Transfers."[42]

The wage determinations issued by the Secretary of Labor did contain a basic seniority concept:

> Where eligibility for a fringe benefit listed herein depends upon an employee's length of service, i. e., Severance pay, vacation, etc., credit must be given to an employee's total length of service defined as the whole span of continuous service with the present (successor) contractor wherever employed, or predecessor contractor(s) in the performance of similar work at the Federal facility.

J.A. 12, 18. From this language, it is clear that the successor employer must give an employee it hires credit for similar work performed at the federal facility. The successor employer must provide workers with an equal amount of seniority the same wages and fringe benefits they would have received under the predecessor contract. Thus, seniority must be recognized by the successor in compensating the employees and providing them with other benefits.

■■■ We do not believe that the Act requires more than this. Seniority is not a form of compensation that the employer can pay. It is not specifically listed as a section 351(a)(2) fringe benefit, and it is not in the same class as the other benefits listed there. Seniority is but a means of determining how wages and fringe benefits are to be allocated. *See Franks v. Bowman Transportation Co.,* 424 U.S. 747, 766, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976); *Davis v. Alabama Power Co.,* 383 F.Supp. 880, 888 (N.D.Ala.1974), *aff'd per curiam,* 542 F.2d 650 (5th Cir. 1976), *aff'd,* 431 U.S. 581, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977). For the reasons given earlier with respect to Art.

26, § 10, seniority is not a "fringe benefit" within the meaning of section 351(a)(2). Instead, seniority is a means for determining the entitlement to a fringe benefit, and this was recognized in the wage determinations.

For these reasons, we disagree with the district court's apparent conclusion that the wage determinations should have gone farther.

## VI. CONCLUSION

■■■ It is true that certain kinds of obligations of predecessor employers toward their employees may be imposed on successor employers as a matter of federal labor law in certain circumstances. *See Howard Johnson Co. v. Detroit Local Joint Exec. Bd.,* 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *NLRB v. Burns Int. Security Service, Inc.,* 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964). But here the question is to what extent the Service Contract Act imposes an obligation on a successor to adhere to a provision in a collective bargaining agreement that requires the successor to make a payment to the predecessor's employees if that workforce is not hired by the successor. The federal government will not contract with successors who do not meet certain wage and fringe benefit standards contained in prior collective bargaining agreements. The obligations imposed by Art. 26, § 10 are not among those which Congress has insisted that a successor meet. Hence, the Secretary of Labor did not violate the Act when he excluded that provision as well as other seniority rights provisions from the wage determinations. The judgment of the district court is therefore reversed, and the case is remanded for proceedings consistent with this opinion.

*Judgment accordingly.*

LUMBARD, Senior Circuit Judge, dissenting:

I dissent from my brother's conclusion that a collective bargaining agreement pro-

---

**42.** *See* notes 16 and 17 *supra* and accompanying text.

vision requiring successor contractors to afford severance pay to any of the incumbent contractor's employees that are not retained is not a "fringe benefit" within the intendment of the Service Contract Act, 41 U.S.C. § 351 to § 358 (the Act). The relevant portions of the Act state generally that successors to government service contracts must pay their employees no less than the wages and fringe benefits required by their predecessors' collective bargaining agreements. By excluding severance pay from the fringe benefits that successor contractors must provide, the majority effectively scuttles the Act's clear purpose to protect government service employees from job disruptions that all too commonly attend the awarding of a new service contract.

Trinity Services, Inc. (Trinity) provided janitorial services at Cape Canaveral Air Force Station and Patrick Air Force Base in Florida under two contracts that expired November 30, 1976. In performing its duties at the two Air Force facilities Trinity employed members of the Transport Workers International Union (TWIU) and the Service Employees International Union (SEIU), with both of whom Trinity had collective bargaining agreements. Article XVI, section 10 of each of these agreements provided that

. . . any successor to the instant contract, whether it be Trinity Services, Inc. or any other contractor shall be in exactly the same position with respect to severance pay liability for any employees that it may elect to terminate for reasons other than permitted by this Article. The incumbent contractor [(Trinity)] and its successor shall be deemed the same for the purpose of determining severance pay liability and loss of the contract to a successor shall not be considered a severance. Conversely, refusal to hire by a successor for reasons other than permitted by this Article shall be considered a

severance for which the successor shall be liable.

Shortly before Trinity's service contracts were due to expire, the Air Force filed with the Department of Labor notices of its intention to enter into new contracts, as required by 29 C.F.R. § 4.4 (1977). Thereafter, on October 22, 1976, the Labor Department issued "wage determinations" setting forth the minimum wages and fringe benefits that any contract covering the janitorial work at the two Florida Air Force bases would have to include. See 41 U.S.C. § 358; 29 C.F.R. § 4.3 (1977). Although these wage determinations included a general provision concerning seniority for employees at the bases,[1] the Secretary of Labor determined, without first holding a hearing, that article XVI, section 10 should not be included within the wage determinations as it did not provide a "bona fide fringe benefit" under the Act.

On October 27, 1978, Trinity filed this action seeking declaratory and injunctive relief against the Department of Labor and the Air Force. Trinity argued that article XXVI, section 10 of its collective bargaining agreements should be included within the wage determinations since the section provided "fringe benefits" required to be included in successor contracts by virtue of 41 U.S.C. § 353(c). The district court agreed, finding that the policy behind the Service Contract Act suggests that "fringe benefits" should be given a broad enough meaning to include the seniority benefits conferred by article XXVI, section 10. See *Trinity Services, Inc. v. Usery*, 428 F.Supp. 318 (D.D.C.1976). Accordingly, the district court enjoined the Air Force from soliciting bids for a new custodial services contract without the provisions of article XXVI, section 10. 41 U.S.C. § 353(c) provides in relevant part that

[n]o contractor . . . under a contract which succeeds a contract subject to

---

1. Each wage determination provides:

Where eligibility for a fringe benefit listed herein depends upon an employee's length of service, i. e. [severance pay] [sick leave], vacation, etc., credit must be given to an employee's total length of service defined as

the whole span of continuous service with the present (successor) contractor wherever employed, or predecessor contractor(s) in the performance of similar work at the Federal facility.

this chapter and under which substantially the same services are furnished, shall pay any service employee under such contract less than the wages and fringe benefits . . . to which such service employees would have been entitled if they were employed under the predecessor . . . .

It is conceded that Trinity's contracts were subject to the Act and that the new contracts are for substantially the same services. Thus, the only question on appeal is whether the district court correctly concluded that article XXVI, section 10 of the Trinity contracts provided "fringe benefits" within the meaning of § 353(c).[2]

Fringe benefits are defined in 41 U.S.C. § 351(a)(2) to include:

medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the foregoing, unemployment benefits, life insurance, disability and sickness insurance, accident insurance, vacation and holiday pay, costs of apprenticeship or other similar programs *and other bona fide fringe benefits* not otherwise required by Federal, State, or local law to be provided by the contractor or subcontractor. (Emphasis supplied.)

The very language of § 351(a)(2) indicates the liberality with which Congress used the words "fringe benefits"; after a nearly exhaustive list of benefits traditionally provided in collective bargaining agreements, § 351(a)(2) goes on to include all "other bona fide fringe benefits."[3] Moreover, it would be anomalous indeed if employees were given the power to retain the numerous types of negotiated benefits mentioned in §351(a)(2) *if* they are fortunate enough to keep their jobs, but were not given the obviously crucial power to negotiate collective bargaining agreements that would guarantee that they *would* keep their jobs. By embracing this anomaly, the majority allows a successor employer to vitiate the requirements of the Act by refusing to hire any of Trinity's workforce and thereby avoiding payment of all the seniority-based benefits mandated under the unions' collective bargaining agreements with Trinity.

Beyond the language of the statute, the legislature history of the Service Contract Act, as amended in 1972, provides strong evidence that Congress intended to require provisions such as article XXVI, section 10 to be included in successors' contracts. When initially passed in 1965, the Act was meant "to provide labor standards for the

2. Trinity does not argue, and the district court did not find, that the Service Contract Act itself requires that employees of a predecessor contractor be hired by a successor contractor. Rather, the question is whether article XXVI, section 10 of Trinity's agreements, as part of collective bargaining agreements subject to 41 U.S.C. § 353(c), must be applied to all successors of Trinity. Thus, if Trinity's collective bargaining agreements had not included article XXVI, section 10, there would be no question whether Trinity's successors were obligated to hire Trinity's employees. This explains why the Subcommittee on Labor-Management Relations of the House Committee on Education and Labor has found the Service Contract Act ineffective in protecting employees from being fired when a new employer receives a government contract; only by making continued employment of a predecessor's employees a specific requirement of the Act could Congress protect employees whose collective bargaining agreements do not include provisions such as article XXVI, section 10. See Subcommittee on Labor-Management Relations of the House Committee on Education and Labor, Plight of

Service Worker, 94th Cong., 1st Sess. 8–9 (Comm.Print, April 1975). See also Subcommittee on Federal Spending Practices, Efficiency, and Open Government of the Senate Committee on Government Operations, May 17, 1976, Problems of Service Contract Act and Protection of Florida Cape Workers, 94th Cong., 2d Sess. 3 (1976).

3. In the instant action the Secretary of Labor determined that the job security benefits of article XXVI, section 10 are not "other fringe benefits" for purposes of the Act. Although in other contexts such an administrative determination might be entitled to some weight, the history of the Service Contract Act indicates that we should carefully scrutinize any decision of the Secretary of Labor which conservatively interprets the reach of the Act. Indeed, it appears that the Secretary's recalcitrance in enforcing the Act to the benefit of government service workers was a major motivating factor behind Congress' action in amending the Act in 1972.

protection of employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal agencies." 1965 U.S.Code Cong. & Admin. News, p. 3737. The House Education and Labor Committee's report concerning the Act emphasized that "[t]he Federal Government has added responsibility in this area because of the legal requirement that contracts be awarded to the lowest bidder." Id. at 3739. Since labor costs are often the most susceptible to adjustment by employers, the competition engendered by federal law requiring that contracts be awarded to the lowest bidder encouraged artificial depression of wage rates and other fringe benefits. See 111 Cong.Rec. 24388 (Sept. 20, 1965). Thus, the 1965 Act required the Secretary of Labor to establish "wage determinations" setting minimum levels for wages and fringe benefits in government service contracts.

After observing the Act's operation for seven years, Congress in 1972 amended the Act to require that successors to government service contracts pay no less than the wages and fringe benefits set forth in their predecessors' collective bargaining agreements. See 41 U.S.C. § 353(c). Discussion on the floor of the House of Representatives at the time of the enactment of the 1972 amendments demonstrates Congress' concern that the Service Contract Act of 1965 had not adequately protected service employees from substantial disruptions in their employment situation with the issuance of each new contract. See 118 Cong.Rec. 27136–37 (Sept. 19, 1972).

Indeed, the nature of government contract bidding is such that, without a provision similar to article XXVI, section 10, employees will invariably lose their status when new contracts are issued. As salary rates and many fringe benefits are based upon seniority, it will always be in the best interest of a successor contractor to replace his predecessor's workforce to the greatest extent practicable. In this way contractors other than the incumbent can trim their labor costs and reduce their bids below that of the incumbent. Such economizing at the cost of job security for government service employees is precisely what Congress has sought to avoid in the Service Contract Act. See, e. g., 118 Cong.Rec. 27139 (Aug. 7, 1972).[4]

In the instant case, the collective bargaining agreements between Trinity and the unions guarantee employees of Trinity job security despite changes in the government service contract under which they are employed. By refusing to include these guarantees within the class of fringe benefits enforceable against successors, the majority deprives the workers of the means to avoid through collective bargaining the very evil Congress has repeatedly sought to prevent: the loss of substantial benefits that often follows reissuance of government service contracts.[5]

In sum, the language of the Service Contract Act, the Act's purpose and its legislative history all strongly support the district court's conclusion that the negotiated job security guarantees of Trinity's collective bargaining agreements are among the fringe benefits that Congress has chosen to impose on contractors who succeed to

---

4. Ironically, it appears that the specific situation that prompted Congress' 1972 amendments to the Service Contract Act was the plight of government service workers at Cape Canaveral (then Cape Kennedy) and Patrick Air Force Base. See 118 Cong.Rec. 27137 (Aug. 7, 1972). Thus, Congress was not only concerned with precisely the type of situation presented in the instant case—it was concerned about the way job insecurity affected *the very employees here involved.*

5. Appellant argues and the majority seems to agree that the severance pay obligation imposed by article XXVI, section 10 would serve to enhance Trinity's competitive position by saddling any potential successor contractor with liabilities that Trinity as the incumbent would never face. What that argument disregards is that Trinity itself, as stated explicitly in article XXVI, section 10, faces severance pay liability if it prevails in the bidding for a new contract and attempts to replace the senior and more expensive employees in its workforce. All article XXVI, section 10 does is establish competitive parity by placing other contractors in the same position as Trinity.

government service contracts.[6] Accordingly, I would affirm the order of the district court.

---

**6.** An additional factor militating against the majority's interpretation of the Act is that fringe benefits not honestly negotiated can be stricken from the Secretary of Labor's wage determinations if they are found to be at variance with those prevailing for other employees similarly situated. Thus, if it is true in the instant case, as the majority suggests it is, that the severance pay obligation was not the product of actual bargaining, that fact should emerge in a comparison of Trinity's collective bargaining agreements with those governing related employment in the private sector. If the point were pressed by the Secretary of Labor, I would remand this case to allow him an opportunity to decide, after holding a hearing as required by the Act, whether the guarantees of article XXVI, section 10 deviate significantly from the terms of other employees similarly situated. See 41 U.S.C. § 353(c).