Wayne C. SELLERS and Sellers & Company, Plaintiffs,

v.

The Honorable Jack KEMP, The United States Department of Housing and Urban Development, and Elaine M. Dudley, Defendants.

No. 89–1142–CV–W–1.

United States District Court, W.D. Missouri, W.D.

Oct. 23, 1990.

Jean Paul Bradshaw, II, Alleen S. Castellani, Kansas City, Mo., for plaintiffs.

Sylvester James, Jr., Blackwell Sanders Matheny Weary & Lombardi, Kansas City, Mo., for defendants.

## ORDER

WHIPPLE, District Judge.

On December 7, 1989, plaintiffs filed a petition for review of a decision by Elaine M. Dudley, Secretary designee of the United States Department of Housing and Urban Development ("HUD"), wherein plaintiffs were debarred from contracting with any department in the executive branch of government for three years. Plaintiffs filed their brief in support of their petition on February 26, 1990; defendants filed a motion for summary judgment in response to plaintiffs' brief, and both parties filed responses to the other's pleadings.[1]

## I. FACTS

Plaintiff Wayne C. Sellers is a Certified Public Accountant ("CPA"), who is the sole proprietor of plaintiff Sellers & Company (collective plaintiffs "Sellers"). Sellers is a minority-owned and operated certified public accounting firm which does 62% of its business with the federal government. Defendant HUD is a federal agency which provides housing for lower-income persons, and Jack Kemp is the current Secretary of HUD. As previously mentioned, Elaine M. Dudley, the Secretary designee (hereinafter "Secretary") rendered the decision at issue in the case at bar.

The Housing Authority of Kansas City (HAKC) is a public housing authority which does business with HUD. Pursuant to HUD requirements, the HAKC underwent biennial audits of its accounting and bookkeeping systems. Sellers performed the audits for the two-year periods covering 1978–1979, 1980–1981 and 1982–1983, and on October 22, 1985, Sellers entered into a contract with the HAKC to perform the audit for the two-year period ending December 31, 1985.

These biennial audits must be made in accordance with certain auditing standards set forth by the Government Accounting Office ("GAO") and with the generally accepted American Institute of Certified Public Accountants ("AICPA") auditing standards. Under these standards, an accountant must give a qualifying opinion or finding within an audit report whenever the audited entity practices an accounting method which does not comply with generally accepted accounting practices or (as in this case) HUD accounting requirements. The qualifying opinion is meant to put persons reading the audit report on alert for

1. Defendants filed a reply to plaintiffs' response to defendants' motion for summary judgment which plaintiffs claim is really a reply to plaintiffs' reply to defendants' response to plaintiffs' brief [defendants' motion for summary judgment] which is not allowed under this court's Local Rules or the briefing schedule entered by the court.

Therefore, plaintiffs argue that the court should strike defendants' reply, filed May 8, 1990. The court's briefing schedule did not contemplate or require motions for summary judgment since the court is of the opinion that a motion for summary judgment is not the appropriate means for disposing of appeals to the district court. However, the court takes note of the fact that most litigants utilize motions for summary judgment for this very purpose. It appears that defendants legitimately believed that the court's briefing schedule did not preclude this practice. With this in mind, defendants' reply was proper since it can be considered not as a reply to a reply (which is improper) but rather, is a reply to plaintiffs' response to defendants' motion (which is proper). Therefore, the court will take all the pleadings filed into consideration in rendering its decision on the merits of plaintiffs' petition for review.

any abnormal accounting procedures utilized by the audited entity.

In the instant case, the HAKC had an unorthodox way of reporting cash contained in its public housing program account (the 1042 account) and in its four Section 8 housing program accounts.[2] The HAKC took all the cash from the Section 8 program accounts and put it in the 1042 account. The 1042 account was in essence a hybrid of a master account and a revolving fund. Using the 1042 account as a kind of master account made it easier for the HAKC to pay for running the separate programs because it allowed the HAKC to pay all expenses from only one account instead of paying out from five separate accounts. The 1042 master account also made investing funds simpler since, again, the HAKC only had to deal with one lump sum rather than different sums from separate accounts. However, in its financial statements, the HAKC reported the monies obtained from the Section 8 accounts as "accounts receivables-other," rather than as cash.

HUD financial analysts who worked on a regular basis with employees of the HAKC were familiar with the HAKC's irregular manner of reporting the cash in the 1042 account. HUD had expressed concern with the manner in which this cash was reported on the financial statements, but it was not until after the 1984/1985 audit that HUD asked the HAKC to change this accounting method. The HAKC's method of accounting for this cash was not according to generally accepted accounting principles or HUD accounting requirements.

The HAKC audit report issued by Sellers for years 1984–1985 did not contain a qualifying opinion regarding how the HAKC reported the cash in the 1042 account or the Section 8 accounts. Wayne Sellers, as managing partner, signed this audit report giving final approval of the report and ensuring that the report complied with the required standards. The audit report was then distributed to the HAKC and HUD.

Although the HAKC's accounting method distorted the amount of cash on hand, it did not distort the HAKC's overall financial condition. Sellers' omission of a qualifying opinion did not cover up any type of theft, fraud or embezzlement by the HAKC.

The Regional Inspector General for Audit ("RIGA") first reviewed the audit report as part of its quality control review and accepted it. The report then went to HUD. A financial analyst for HUD, Alan Shields, looked over the report and noticed that approximately 2.1 million dollars in cash and short-term investments that were noted in Sellers' work papers were not documented as "cash" in the HAKC's financial statements. Shields sent the audit report back to RIGA, instructing them to review it again because of the discrepancy between the auditor's work papers and the HAKC's financial statements—which clearly did not indicate 2.1 million in cash.

After RIGA re-reviewed the audit report it informed Sellers that the audit report was unacceptable. Thereafter, Sellers, HAKC officials, RIGA officials and HUD officials met to discuss the problems with the audit report and the HAKC's financial statements. Initially it appeared that RIGA and HUD would be content with accepting the report with a cover letter of some sort which would explain the HAKC's accounting method. Later, they (HUD and RIGA) apparently changed their minds and wanted Sellers to persuade the HAKC to change their financial statements and to change its audit report so that the 2.1 million dollars would be reflected as cash in the 1042 account. This is significant because HUD is entitled to any interest earned from public housing money or, in other words, money in the 1042 account. Equally important is the fact that HUD is *not* entitled to any excess interest income from Section 8 funds. The HAKC refused to change their financial statements alleging that all the funds in the 1042 account were not public housing funds and, therefore, should not be reflected as such.

---

**2.** The HAKC was responsible for administering not only the public housing program but four Section 8 housing programs as well. Each program had a different account which was allotted a certain amount of funds.

Additionally, HUD wanted Sellers to investigate what amount of cash should legitimately be attributed to public housing money in the 1042 account versus Section 8 funds. After a certain period of time and much communication between all the parties involved, Sellers, HUD and RIGA realized it was going to take some time for Sellers to make this additional accounting and to persuade the HAKC to change their financial statements. The additional accounting was never completed because the HAKC refused to cooperate with Sellers; and the HAKC never agreed to change their financial statements.

Finally, on April 17, 1987, Louis Davis, Sellers' employee in charge of the HAKC account who supervised the work on the 1984–1985 audit, issued a revised audit report to HUD.[3] The revised report indicated that the HAKC's financial statements showed 2.1 million in cash in the 1042 account. Additionally, the revised report had a finding or qualifying opinion which described the way the HAKC reported cash in its 1042 account. HUD accepted this report despite the fact that it was not done according to generally accepted accounting principles.[4]

On May 22, 1987, HUD sent a letter to Wayne Sellers stating that HUD had accepted the revised report and that HUD was still going to pursue sanctions against Sellers because of the deficiencies in the original audit report. Wayne Sellers wrote a letter dated June 18, 1987 to HUD stating that he did not know a revised report had been issued and further stated that it was not authorized.[5] For some inexplicable reason, Sellers' letter was not received by HUD until January 19, 1988. Since Sellers'

June 18th letter stated that the revised report was not authorized, HUD was left with the original report as the only authorized HAKC audit report for 1984/1985.

Thereafter, Sellers made no real effort to issue another authorized audit report that would be acceptable to HUD.[6] Wayne Sellers never articulated a reasonable explanation of why efforts were not made to issue another revised report. Sellers admitted that he had the option of issuing a revised report with a disclaimer that Sellers was disassociating itself from the HAKC's financial statements but again, for some inexplicable reason Sellers chose not to exercise that option.

On July 27, 1988, a one-year Limited Denial of Participation ("LDP") was imposed on Sellers, and on October 18, 1988 HUD suspended Sellers and informed Sellers that HUD intended to debar them from contracting with federal programs for three years. On February 15, 1989 an evidentiary hearing commenced before Administrative Law Judge Jean S. Cooper ("ALJ") regarding the imposition of the LDP, suspension, and proposed three-year debarment. On August 2, 1989 the ALJ issued her opinion, wherein she upheld the suspension and found grounds for debarment pursuant to 24 C.F.R. § 24.305(b)(1) and 24.405, but found no cause for debarment under 24 C.F.R. § 24.305(d). Additionally, the ALJ found mitigating circumstances existed which warranted a debarment for a period of only three months instead of the HUD-proposed three years.

Both Sellers and HUD appealed the ALJ's decision to the Secretary of HUD, pursuant to 24 C.F.R. § 26.25. Defendant

---

**3.** After issuing the report, Louis Davis disappeared, apparently due to emotional problems.

**4.** The revised report did not contain any provision which explained why the original had been revised or what changes had been made and why. Generally accepted accounting principles require that this kind of a statement/explanation be included in an audit report whenever a revised report is issued.

**5.** By "authorized" Sellers meant that the HAKC had not authorized the issuance of the revised report received by HUD; Sellers did not mean

to imply that Sellers had not authorized its issuance (although Wayne Sellers himself was not aware that Mr. Davis had issued a revised report).

**6.** Wayne Sellers did testify however, that attempts were made to find Mr. Davis, who had disappeared, to question him about the revised report that was issued. However, Sellers was not able to locate Mr. Davis. How Sellers' failure to locate Mr. Davis impacted on Sellers' ability or disposition to issue another revised report is unclear.

Dudley, as the Secretary's designee, heard the matter and issued her determination on October 31, 1989. In her decision, she affirmed the ALJ's findings that grounds for suspension and debarment existed under 24 C.F.R. §§ 24.305(b)(1) and 24.405, but reversed the ALJ's finding that there was no cause for debarment under 24 C.F.R. § 24.305(d). More importantly, she reversed the ALJ's finding that mitigating circumstances existed to reduce the debarment to three months, and imposed a three-year debarment (through July 27, 1991).

## II. DISCUSSION

■ Judicial review of the Secretary's decision is based on the Administrative Procedures Act ("APA"), 5 U.S.C. § 701, *et seq.* The APA states in relevant part that "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ..." 5 U.S.C. § 706(2)(A).

The United States Supreme Court has held that the reviewing court must determine if there is a "rational connection between the facts found and the choice made." *Bowman Transportation v. Arkansas–Best Freight,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974). The court's review is a narrow one; it cannot reverse an agency's decision unless it finds that the decision was not supported by substantial evidence, or there was a clear error in judgment. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416–417, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136 (1971). However, "[i]n employing this deferential standard of review ... a court does not rubber stamp the action of the agency." *Port of Jacksonville Maritime Ad Hoc Committee, Inc. v. U.S. Coast Guard,* 788 F.2d 705, 708 (11th Cir.1986).

After careful review of the entire record below, including a thorough reading of the transcript of the hearing before the ALJ, the court finds there was a rational basis

for the Secretary's decision that cause existed for suspension and debarment under 24 C.F.R. §§ 24.305(b)(1) and 24.405. However, the court finds the Secretary's reversal of the ALJ's finding that no cause for debarment existed under § 24.305(d) must be reversed. Additionally, the court finds the Secretary's reversal of the ALJ's finding of mitigating circumstances, and imposition of a three-year debarment was arbitrary, capricious, and not rationally connected to the facts of this case.

### A. *Debarment*

■ Under 24 C.F.R. § 24.305(b)(1), debarment is appropriate for

> Violation of the terms of a public agreement or transaction so serious as to affect the integrity of an agency program, such as (1) [w]illful failure to perform in accordance with the terms of one or more public agreements or transactions
> ...

In the instant case, the evidence clearly revealed that Sellers willfully failed to perform in accordance with the terms of the contract it had with the HAKC. The contract stipulated that the audit report must be executed according to generally accepted accounting principles and HUD requirements. All parties agree, including Sellers, that in order to originally have been in compliance with the aforementioned accounting requirements the audit report should have contained a qualifying opinion or finding regarding the manner in which the HAKC reported cash in its financial statements. Sellers failed to include such a finding in its original audit report. Moreover, Wayne Sellers made no attempt to issue another revised report after he informed HUD that the revised report they had accepted was unauthorized by the HAKC. Therefore, the court cannot disturb the Secretary's finding that cause for debarment existed under §§ 24.305(b)(1) and 24.405.[7]

■ Next, the court addresses whether Sellers could be debarred pursuant to 24

---

7. Under § 24.405, a party may be suspended if cause for debarment exists under § 24.305(b)(1). Accordingly, it is not necessary

to find an independent cause for debarment under § 24.405.

C.F.R. § 24.305(d), which states that debarment is appropriate for

Any other cause of so serious or compelling a nature that it affects the present responsibility of a person.

(1) These causes include but are not limited to:

(i) Failure to comply with Title VII of the Civil Rights Act of 1968 or Executive Order 11063, HUD's Affirmative Fair Housing Marketing regulations or an Affirmative Fair Housing Plan;

(ii) Violation of Title VI of the Civil Rights Act of 1964, section 109 of the Housing and Community Development Act of 1973, section 504 of the Rehabilitation Act of 1073, or the Age Discrimination Act of 1975;

(iii) Violation of any law, regulation, or agreement relating to conflict of interest;

(iv) Violation of nondiscriminatory provisions included in any agreement or contract ...

Plaintiffs argue that the doctrine of *ejusdem generis* limits causes for debarment to the four specific examples enumerated or causes related to the examples enumerated. The Secretary found that § 24.305(d) was not so limited even if the doctrine of *ejusdem generis* was applicable because the general terms of the regulation *precede* the specific terms. The court disagrees with the Secretary.

It is a well-settled principle of statutory construction that where specific words *precede or follow* general words in an enumeration describing a particular subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the specific words.

*Trinity Services, Inc. v. Marshall*, 593 F.2d 1250, 1258 (D.C.Cir.1978) (emphasis added); *See also, Carlyle Compressor Co. v. OSHRC*, 683 F.2d 673, 675 (2nd Cir. 1982). The doctrine of *ejusdem generis*

"directs that a general provision of a statute will be controlled and limited by subsequent statutory language more specific in scope." *Wedding v. Wingo*, 483 F.2d 1131, 1135 (6th Cir.1973). The United States Supreme Court in *Weyerhaeuser S.S. Co. v. United States*, 372 U.S. 597, 600–601, 83 S.Ct. 926, 928–929, 10 L.Ed.2d 1, 4–5 (1963), held that "the traditional rule of statutory construction ... counsels against giving to general words a meaning totally unrelated to the more specific terms of a statute ..."

█ Therefore, the "but not limited to" language in § 24.305(d) is limited in scope by the specific examples following this general language and/or other acts similar to those enumerated. The specific acts enumerated deal with discriminatory acts or violations regarding conflicts of interest. The court finds that the violation at issue here is completely unrelated to the acts enumerated in § 24.305(d), and thus, cannot be encompassed within the general language of the regulation. An auditor's omission in an audit report, especially the technical omission involved in this instance, is not related in any sense to the type of conduct of concern in § 24.305(d).

There is no evidence that the framers of this regulation had any other intent. Furthermore, the Secretary failed to cite one authority to support her deviation from sound judicial precedent regarding statutory construction. Accordingly, the Secretary's determination that cause for debarment existed under § 24.305(d) must be reversed.

### B. *Mitigating Circumstances*

█ Having found a rational basis for the Secretary's finding that there was cause for suspension and debarment under §§ 24.305(b)(1) and 24.405, the court must now address the issue of whether mitigating circumstances existed to warrant a reduction in the period of debarment.[8] The

**8.** The government argues that if the court did not find debarment under § 24.305(d) possible, the court should remand this matter to the Secretary to enable her to determine if mitigating circumstances existed to reduce the period of debarment under §§ 24.305(b)(1) and 24.405. The court does not find remand necessary since

clearly the Secretary's determination on the mitigating factors issue related not only to the debarment under 24.305(d) but also to the debarment pursuant to the other sections at issue. There is nothing in her opinion which indicates that she was limiting the scope of her discussion regarding mitigating factors to only the debar-

Secretary found none. The court not only disagrees with this decision, but also finds there is no rational basis for it. Considering the latter, the court must reverse and vacate this portion of the Secretary's determination.

Section 24.115(d) provides in relevant part that "the seriousness of the contractor's acts or omissions and any mitigating factors should be considered in making any debarment decision." Section 24.300 also states that "the seriousness of the person's acts or omissions and any mitigating factors *shall* be considered in making any debarment decision." (Emphasis added).

The Secretary stated the following with regard to this issue:

> While there had been significant contact between the Respondents [Sellers] and the Department [HUD], it is clear that there was no *real* compliance upon the part of the Respondent. It is difficult to argue that Respondent has been cooperative when reviewing the evidence. In fact, the Hearing Officer mentions that at any time the Respondent needed only to add qualifying statements to his initial report to have been in compliance. If that was indeed true, it compounds the willfulness of the Respondent rather than exonerating him for his 'cooperation.'

*Secretary's Determination*, at page 4, (emphasis in the original).

There is absolutely no basis in the record for finding that Sellers was uncooperative after he was made aware of the problem with the original audit report. The record below is replete with evidence that Sellers was sincerely trying to remedy the prob-

lems raised by HUD. However, addressing those problems was not as easy to do as the Secretary blindly suggests.

The Secretary made her determination [that no mitigating circumstances existed and that the same facts upon which the ALJ based her finding of mitigating factors actually compounded Sellers' willfulness] largely, if not totally, on the assumption that Sellers at "any time ... needed only to add qualifying statements to his initial report to have been in compliance." The problem with this assumption is that it was just that—an assumption.[9]

HUD not only wanted Sellers to add a qualifying opinion but also wanted Sellers to do additional accounting work to determine what funds in the 1042 account were Section 8 funds versus public housing funds. Moreover, HUD wanted Sellers to persuade the HAKC to change their financial statements to indicate the entire 2.1 million as cash in the 1042 account. As noted earlier, the HAKC refused to do so, and remained uncooperative in helping Sellers do the additional accounting work requested by HUD. Sellers did cooperate and unadvisedly attempted to make everyone happy, which is probably where he really went wrong. These facts cannot rationally be seen as compounding Sellers' willfulness.

Additionally, there was uncontroverted evidence that Sellers' initial failure to add a qualifying statement to its original report did not hide the overall financial status of the HAKC. Despite Sellers' omission, HUD was still aware of the HAKC's financial condition since the assets of the HAKC

---

ment under § 24.305(d). The Secretary did not discuss the suspension and debarment under §§ 24.305(b)(1) and 24.405 at length because she affirmed the ALJ's finding regarding debarment under those sections.

9. The Secretary's finding so lacks factual credibility that it appears to the court that she did not carefully review the transcript of the hearing before the ALJ. After stating how simple it would have been for Sellers to be in compliance, the Secretary wrote "[i]f that was indeed true, it compounds the willfulness of the Respondent rather than exonerating him for his 'cooperation.'" The court is disturbed by the

Secretary's uncertainty of what is, in fact, true or not true. It seems to the court that she should *know* (for the answer is clearly within the facts presented at the hearing) what it really took for Sellers to be in compliance.

Of course, the court (and the Secretary as well) is referring to the events after HUD first informed Sellers that they had a problem with the original audit report. It is true that *prior* to the issuance of the original report a qualifying opinion regarding the HAKC's treatment of cash in its financial statements would probably have avoided the problems Sellers subsequently had with HUD.

were not distorted in any way. Also, there was uncontroverted evidence that Sellers' omission did not perpetuate or hide any sort of embezzlement, fraud or theft against HUD. The only problem was that cash was reflected as something other than cash. Also, the court cannot stress enough that HUD was fully cognizant of the HAKC's "adventuresome" accounting procedures as Alan Shield's, HUD's financial analyst, described it. Although HUD's knowledge does not excuse Sellers' omission, it does serve to mitigate the severity of his offense. The Secretary did not consider one of these important facts; rather, she relied solely on her faulty assumption regarding Sellers' case.

Moreover, the Secretary's decision to impose a three-year debarment appears to be punitive. In her determination she stated in relevant part

> The Hearing Officer's decision failed to give weight to the Inspector General's obligations to protect the public interest and will, if not reversed, seriously impede his ability to carry out those duties.
>
> By the debarment of the Respondent, the Department intends to send a strong message that it supports the work of the Inspector General and will not tolerate misleading audit reports and audit work which is not in compliance with applicable auditing standards. If governmental regulations are to have any validity, adherence to their requirements must be assured.

*Secretary's Determination*, at pages 4–5.

Section 24.320(a) provides that "[d]ebarment shall be for a period commensurate with the seriousness of the cause(s);" and § 24.115(b) states that "[d]ebarment and suspension are serious actions which shall be used only in the public interest and for the Federal Government's protection and *not for the purposes of punishment.*" (Emphasis added). The Secretary's language indicates that she wanted to make an "example" out of the plaintiffs rather than fitting the appropriate period of debarment to the actual conduct at issue.

The court is always hesitant to reverse an agency decision given the deferential standard of review the court must utilize. However, this is a classic case of an agency's abuse of discretion and therefore, the court is compelled to reverse the Secretary's determination as explained in this opinion.

Accordingly, it is

ORDERED that the decision of the Secretary dated October 31, 1989 is affirmed in part and reversed in part. It is further

ORDERED that the Secretary's determination is affirmed with regard to her finding that cause existed to suspend and debar plaintiffs pursuant to 24 C.F.R. §§ 24.-305(b)(1) and 24.405. It is further

ORDERED that the Secretary's determination is reversed with regard to her decision to debar plaintiffs pursuant to § 24.305(d). It is further

ORDERED that the Secretary's determination is reversed with regard to her finding that there were no mitigating factors. It is further

ORDERED that the Secretary's determination is reversed with regard to her decision to debar the plaintiffs for a period of three years. It is further

ORDERED that plaintiffs shall no longer be subject to the debarment entered by the Secretary in her determination dated October 31, 1989 or the debarment entered by the Administrative Law Judge on August 2, 1989.[10]

---

10. Considering the court's ruling, the only debarment in effect would be the ALJ's three-month debarment. Neither the ALJ's debarment nor the Secretary's was stayed pending this court's decision. Therefore, plaintiffs have more than served the appropriate period of debarment.